RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0034p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MARILYN SHAZOR,

        *Plaintiff-Appellant*,

      *v.*

PROFESSIONAL TRANSIT MANAGEMENT, LTD,
and THOMAS P. HOCK,

        *Defendants-Appellees*.

No. 13-3253

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:11-cv-00150—S. Arthur Spiegel, District Judge.

Argued: December 4, 2013

Decided and Filed: February 19, 2014

Before: COLE and CLAY, Circuit Judges; BERTELSMAN, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Laura Welles Wilson, BLANK ROME LLP, Cincinnati, Ohio, for Appellant. Susan R. Bell, CORS & BASSETT LLC, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Laura Welles Wilson, Nathaniel R. Jones, Michael L. Cioffi, Lori G. Nuckolls, BLANK ROME LLP, Cincinnati, Ohio, for Appellant. Susan R. Bell, Robert J. Hollingsworth, Alexis L. McDaniel, CORS & BASSETT LLC, Cincinnati, Ohio, for Appellees.

———————————

## OPINION

———————————

CLAY, Circuit Judge. Plaintiff Marilyn Shazor appeals from the district court's grant of summary judgment in favor of Defendants Professional Transit Management,

---

[*] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Ltd. ("PTM") and Thomas P. Hock in this employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Specifically, Plaintiff contends that she presented direct and circumstantial evidence of discrimination on the basis of her sex and race. For the reasons set forth below, we **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

### I.     FACTUAL BACKGROUND

#### A.     PTM and SORTA

PTM offers management services to numerous transit authorities in the United States. One of these authorities is the Southwest Ohio Regional Transit Authority ("SORTA"), which operates public transportation in the Cincinnati area. Beginning in June 2004, PTM provided SORTA with the services of a General Manager, also called the Chief Executive Officer ("CEO"). SORTA's CEO exercises day-to-day control over SORTA, while ultimate management authority resides with SORTA's Board of Trustees. *See* Ohio Rev. Code § 306.34.

The first CEO provided to SORTA by PTM was Michael Setzer, a cofounder of PTM along with Defendant Hock. In 2006, Setzer hired Plaintiff to act as SORTA's Chief Operating Officer. Plaintiff, an African American woman, was a graduate of West Point and the University of Michigan Business School, but she had no prior experience in the transportation field. Two years after Setzer hired Plaintiff, PTM was acquired by a company called Veolia and Setzer was assigned to duties away from SORTA. Plaintiff replaced Setzer as CEO, beginning in March 2008. Plaintiff's contract stipulated that she report to Setzer on behalf of PTM. Her employment was on an at-will basis, giving PTM the right to terminate her at any time without notice. Setzer also agreed to lend assistance to Plaintiff during her early tenure as CEO.

### B.        Plaintiff's first year as CEO

Within a few months of Plaintiff's elevation to CEO, senior officials at PTM began questioning her allegiance to her employer-of-record, that is, to PTM. Plaintiff repeatedly declined to participate in educational programs that PTM offered as part of its complement of management services. Her refusals raised concern in the mind of Will Scott, a one-time president of PTM. After Plaintiff cancelled a meeting with Scott in mid-July 2008, Scott wrote to Setzer to complain: "Is [Plaintiff] trying to distance herself from PTM? I'm really beginning to question her 'loyalty' to us. And she doesn't think about the fact—as you raised—that she had no[]status in public transit just two years ago." (R. 47-2, Setzer Dep. Exs., at 1286.) PTM's unfulfilled training requests to Plaintiff prompted a conversation between Setzer and SORTA's general counsel to establish where Plaintiff's duties lay. Setzer agreed that Plaintiff's full-time job was that of SORTA's CEO, and that she should not be involved in performing any separate duties for PTM.

Tensions between Plaintiff and PTM escalated in early 2009, as PTM and SORTA negotiated a renewal of PTM's management services contract. This contract prohibited PTM employees from working for SORTA within a year of its expiration. Plaintiff's personal contract with PTM contained an identical provision. Notwithstanding these contracts, PTM executives began to suspect that Plaintiff and the SORTA Board Chairperson, Melody Richardson, were conspiring to have SORTA hire Plaintiff directly. Scott expressed his frustrations in an e-mail to Setzer and Hock on February 18, 2009:

> Quite frankly, I'm pretty fed up with [Plaintiff] and her antics, and really don't care to work with her any longer. These are just my thoughts at this stage. We have been extremely accommodating to [Plaintiff], e.g., her salary level (makes more than I do), bonus for a renewal, her not having to comply with PTM/Veolia administrative requests, showing little respect to Mike [Setzer] and me, even though we are the ones who helped her to move up at [SORTA], etc. She is a "prima donna" and not a team-player, and I suspect that she will eventually fail in a big way. This is the worst case I think I've seen after being in the business for over 30 years.

(*Id.* at 1310.)  In the summer of 2009, PTM and SORTA reached a compromise.  The contract was extended for two years and the one-year hiring prohibition was removed from the management services contract and Plaintiff's own contract with PTM.

Setzer and Scott exchanged other less-than-complimentary e-mails about Plaintiff.  For example, in March 2009, Plaintiff sent an e-mail to a large group of people to report that she would be attending a meeting with Vice President Biden.  Richardson replied ecstatically, but Setzer privately asked Scott "Are you gagging yet?"  (*Id.* at 1319.)  In other e-mails, Setzer referred to Plaintiff and Richardson as "the girls."  (*Id.* at 1330.)

Another testy exchange came in May 2009 after Plaintiff had once again resisted completing a survey for PTM.  Plaintiff and Setzer lobbed several e-mails at each other (Plaintiff even copied Richardson), before Scott privately e-mailed Setzer to say:

> [Plaintiff] has turned into a "prima donna" and does not recognize that PTM/Veolia is her co-employer.  For her to have used the tone she used in her email to you is totally unacceptable, and she is showing no respect or loyalty to you.  I have never seen this level of disrespect from an employee during my 30-plus years in the industry. . . .  I'm inclined to have a direct conversation with [Plaintiff] to really get "things off of my chest," however, she would end up using it against me if there are legal actions taken.

(*Id.* at 1326.)  Setzer responded:

> I too am amazed at the lack of class she displays.  I would never have sent my boss, or client, the kind of whiny email that she sent. . . .  She obviously does not understand what a fool she sounds like.  But the key now is to win this.  [Plaintiff's] tone in that email might be useful to us in some future situation.  I will continue to respond professionally and transparently until we reach a finale.  I will give her no ammunition to use against us.
>
> By the way, she's the one who decided to incorporate [Richardson] into this email exchange.  Another indication of her immaturity.  It's like the punk who talks tough only when he's got somebody big standing behind him.

(*Id.*)

PTM executives were also concerned that Plaintiff was prohibiting SORTA employees from consulting with PTM. Ted Bergh, SORTA's Chief Financial Officer, told Setzer that Plaintiff had fired him in July 2009 after Bergh asked Plaintiff if he could consult Setzer about budget issues. When Setzer e-mailed this information to Hock and Scott, Scott replied:

> I am beginning to think that we should act on [Plaintiff] before she does any more damage to what was a very good system. I am afraid that we may have waited too long. She obviously has no idea what she is doing and since she won't go to you for help she is going to continue to sink and [SORTA] is too.

(*Id.* at 1336.)

These complaints surfaced when Setzer gave Plaintiff her one-year review in August 2009. Setzer gave Plaintiff "outstanding" marks for the quality of her work, diversity, and community outreach. But he rated her "does not meet expectations" as to "fosters mutual support." Setzer commented that

> PTM peers do not regard you as a team player. Your failure to participate effectively in company activities has been disappointing. . . . Your tight control on the flow of information—requiring "permission" to communicate with me has also had a negative effect on your staff's perception, as well as denying yourself the benefits of my support and advice.

(*Id.* at 1231.) Setzer also marked Plaintiff negatively for "rapport with team," noting that "[e]mployees, Union, some Board members, and your PTM peers have expressed dissatisfaction with your accessibility." (*Id.* at 1232.) Plaintiff's other areas of review were graded "satisfactory." Notwithstanding the negative comments, as well as the issues surrounding the renewal of PTM's contract with SORTA, Setzer recommended a 3% salary increase—more than the increase in the fees that SORTA would pay PTM. Setzer emphasized that this increase was "unprecedented."

Setzer's review of Plaintiff was just about his last act as her supervisor. In late August 2009, Hock took over this responsibility when Setzer was assigned to different duties. Setzer described his feelings in an e-mail dated August 27, 2009: "I have been

banished to the wilderness by the Wicked Witch [apparently Richardson], and Tom Hock will be replacing me as [Plaintiff's] boss. I'm crushed." (*Id.* at 1339.) Although no longer Plaintiff's supervisor, Setzer had one more e-mail exchange about her with Scott. In mid-April 2010, Scott was working on an executive search for a different transportation authority. Scott wanted to use Setzer as a reference based on the search that ended with Plaintiff being hired as SORTA's Chief Operating Officer in 2006. Scott added a caveat for Setzer: "Just don't share that she turned out to be one hellava bitch. ☺" (*Id.* at 1340.)

### C.    Plaintiff's termination

In early 2010, the union that represents SORTA's bus drivers filed petitions with the Ohio State Employment Relations Board to organize SORTA's driving instructors and maintenance forepersons. As a result, SORTA was faced with the question of what stance to take on the unionization efforts. Plaintiff testified at her deposition that she consulted with her executive team and decided to neither oppose nor support the union drive. Later, her executive team discussed hiring a consultant to advise managers and supervisors on how to handle the issue. According to Plaintiff, SORTA's human resources director and general counsel recommended that they retain Management Performance International, Inc. ("MPI") to advise on these union matters. Plaintiff claimed that she played no part in selecting MPI.

The retention of MPI sparked conflict during a meeting of SORTA's Board on July 20, 2010. One Board member, Doug Sizemore (who was the regional head of the AFL-CIO), was concerned that MPI was anti-labor. A local union president at the meeting suggested that SORTA hire Hock as a labor consultant. Plaintiff told the Board that she had been consulting with Hock informally, but that Hock did not have the time to take on SORTA's union negotiations. Several Board members expressed a desire to speak with Hock and suggested that a special meeting be convened in August to permit them to do so.

At least one Board member indicated that he suspected Plaintiff was not being honest about Hock's availability—Hock had a history of working with SORTA, and

Plaintiff had a history of keeping PTM executives at arm's length.  Hock himself testified that Plaintiff's representation to the Board concerning his lack of availability was a lie.  Plaintiff, however, testified that Hock told her in a phone call that he was too busy to help SORTA.  An e-mail Hock sent Plaintiff, Richardson, and Scott on June 3, 2010, offers some support for this account.  Hock wrote that a local union president asked Hock to attend a meeting "to discuss labor management concerns.  Unfortunately I [Hock] am in labor negotiations next week in Tucson.  I suggested that Will [Scott] might be able to attend."  (R. 55-6, Opp'n to S.J. Exs., at 1950.)  In this same e-mail chain, Plaintiff had asked Hock to provide a proposal for some services, including "ongoing training for supervisors and managers on labor relations and educate them on the basics of how unions operate."  (*Id.* at 1951.)  On June 3, 2010, Hock forwarded a "Conceptual Proposal for the Labor Relations Training."

On the afternoon of August 12, 2010, the SORTA Board's labor management committee held a follow-up meeting that Hock attended.  The committee discussed the retention of MPI and whether they were the best alternative, given their perceived anti-labor bent.  Plaintiff told the committee that she had not made the choice to retain MPI; her staff had.  Hock stated that he was available to consult SORTA on the unionization drive—and that Plaintiff had not been telling the truth when she said otherwise.

On August 19, 2010, Scott sent Hock an e-mail containing a checklist of "operational issues involved in wrapping up an individual's employment with the Company."  (R. 55-4, Opp'n to S.J. Exs., at 1939.)  Scott told Hock that "[p]lans need to be made immediately as you are executing the termination [tomorrow]."  (*Id.*)  The next day, Hock fired Plaintiff from her position as SORTA's CEO.  Even though Plaintiff had repeatedly clashed with PTM executives during her term as CEO, Hock claimed that he made his decision based on two purported lies that Plaintiff told the Board—specifically, her statement that Hock was too busy to advise SORTA; and her representation that she had not played a role in hiring MPI.  Hock claimed he had not consulted Richardson or the Board before he fired Plaintiff.  But Hock had spoken with Bill Desmond, SORTA's general counsel, to determine what Plaintiff had told the Board.

Desmond apparently told Hock that Plaintiff had refused to hire Hock or PTM to advise on union issues. Hock made no further investigation into Plaintiff's supposed lies beyond this conversation with Desmond.

Hock took over as SORTA's CEO on a temporary basis while PTM and SORTA searched for a permanent replacement. PTM recommended four candidates for the post, and the personnel committee of SORTA's Board interviewed two of them. The Board eventually selected Theresa Crews, an Hispanic woman, to serve as Plaintiff's permanent replacement. Crews started as SORTA's CEO on November 1, 2010.

## II.    PROCEDURAL HISTORY

Plaintiff filed a charge of discrimination with the EEOC shortly after she was fired. When the EEOC declined to pursue the charge, Plaintiff filed suit in the U.S. District Court for the Southern District of Ohio on March 10, 2011. Plaintiff asserted five causes of action: (1) race discrimination in violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e *et seq.*; (2) gender discrimination in violation of Title VII; (3) defamation, libel, and slander; (4) race discrimination in violation of Ohio Rev. Code ch. 4112; and (5) tortious interference with a business relationship. After discovery, the parties cross-moved for summary judgment. The district court granted Defendants' motion as to Plaintiff's state and federal discrimination claims and declined supplemental jurisdiction over Plaintiff's state-law tort claims. *See Shazor v. Prof'l Transit Mgmt., Ltd.*, No. 11-CV-150, 2013 WL 494518 (S.D. Ohio Feb. 7, 2013). Plaintiff timely appealed.

## DISCUSSION

Title VII prohibits an employer from discharging an employee based on her race, color, or sex, among other things.[1] *See* 42 U.S.C. § 2000e-2(a)(1). A plaintiff can fend off a motion for summary judgment on a Title VII claim using either direct or circumstantial evidence of discrimination. *See Logan v. Denny's, Inc.*, 259 F.3d 558,

---

[1]The parties have briefed only Plaintiff's Title VII discrimination claims.

566–67 (6th Cir. 2001).  If a plaintiff goes the circumstantial route (and her case does not rely on a mixed-motive theory), we analyze the motion for summary judgment following the familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 n.10 (6th Cir. 2008). If a plaintiff relies on direct evidence of discrimination, *McDonnell Douglas* does not apply.  *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012). Plaintiff asserts that she has presented both direct and circumstantial evidence of discrimination, making summary judgment in favor of Defendants improper.

We review *de novo* a district court's grant of summary judgment.  *See Arendale v. City of Memphis*, 519 F.3d 587, 593 (6th Cir. 2008).   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In reviewing the district court's grant of summary judgment, this Court must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Birch v. Cuyahoga Cnty. Probate Court*, 392 F.3d 151, 157 (6th Cir. 2004).  The same standard applies when the parties have filed cross-motions for summary judgment—each motion is evaluated by reading the evidence and resolving any doubts in favor of the nonmovant.  *See Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

## I.     DIRECT EVIDENCE OF DISCRIMINATION

We first discuss Plaintiff's direct evidence theory.  "Direct evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006).  "Such evidence does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Tepper v. Potter*, 505 F.3d 508, 516 (6th Cir. 2007) (quotation marks omitted).  Once a plaintiff produces direct evidence of discrimination, "the burden shifts to the employer to prove by a preponderance of the

evidence that it would have made the same decision absent the impermissible motive." *Chattman*, 686 F.3d at 346–47 (quotation marks omitted).

Plaintiff's purported direct evidence consists of the numerous e-mails between Setzer and Scott in which they speak of Plaintiff in less than flattering terms, including calling her a "prima donna," disloyal, disrespectful, and a "hellava bitch." But neither Setzer nor Scott fired Plaintiff—Hock did. If these e-mails are direct evidence of discrimination, it must be based on a "cat's paw" theory of liability. In a cat's paw case, the plaintiff seeks "to hold [her] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 (2011). Plaintiff must establish two elements for cat's paw liability to apply: (1) that Setzer and Scott intended to cause an adverse employment action for discriminatory purposes; and (2) that these discriminatory actions were the proximate cause of the ultimate employment action. *See Chattman*, 686 F.3d at 351 (citing *Staub*, 131 S. Ct. at 1194). Defendants can defeat the second element if they show that Hock fired Plaintiff after an independent investigation that resulted in reasons for terminating Plaintiff "'unrelated to the supervisor's original biased action.'" *Id.* at 352 (quoting *Staub*, 131 S. Ct. at 1193).

Applying *Staub*'s rule to this case raises several complex issues of law and fact. First, it is unclear whether Setzer and Scott constitute "supervisors" for the purpose of cat's paw liability. In *Vance v. Ball State University*, 133 S. Ct. 2434 (2013), a Title VII harassment case, the Supreme Court held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* at 2439. Setzer certainly fit this role when he was Plaintiff's direct supervisor, a post he held until August 2009. It is not settled whether Setzer's one-time role as Plaintiff's supervisor suffices for cat's paw purposes when the ultimate employment action came a year later. It is also unclear whether Setzer and Scott qualified as supervisors on the basis of their senior roles in PTM. Nor has this Court ruled on whether *Staub* can be applied, in particular cases, to

the actions of employees who do not meet the definition of "supervisor" enunciated in *Vance*. *Staub* left this question unresolved. *See Staub*, 131 S. Ct. at 1194 n.4.

Second, our case law does not easily resolve whether Setzer's and Scott's e-mails show that they intended to cause Plaintiff's termination for discriminatory reasons. One of these e-mails unambiguously reveals sexist animus—Scott's statement that Plaintiff was "one hellava bitch." But the other e-mails are more veiled. Plaintiff herself argues that the e-mails are "code for 'angry black woman' or 'uppity black woman.'" (Appellant's Br. at 33.) Viewed as a whole, Setzer's and Scott's correspondence might only show "occasional[]" sexist and racist comments, which would not be enough to establish direct evidence of discriminatory intent. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1249 (6th Cir. 1995), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Third, causation presents a difficult question in this case. Most of the e-mails that Plaintiff points to were sent a year or more before Hock fired her—longer than the usual span of time that can support an inference of causation. *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 756 (6th Cir. 2012); *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007). Hock was not even copied on many of these e-mails. Scott did send Hock a termination checklist the day before Plaintiff was fired, but this is hardly iron-clad proof that Scott was involved in the adverse employment decision.

It is by no means clear whether summary judgment was appropriate on Plaintiff's direct evidence claim. Fortunately, we need not resolve these tangled questions of law and fact. We hold below that Plaintiff presented sufficient circumstantial evidence of discrimination to survive Defendants' motion for summary judgment. As a result, there is no need for us to rule on Plaintiff's direct evidence theory. *See Chattman*, 686 F.3d at 347. The factfinder will have the opportunity to consider the evidence Plaintiff has offered and its ultimate impact on Plaintiff's discrimination claims.

## II.    CIRCUMSTANTIAL EVIDENCE OF DISCRIMINATION

We next address Plaintiff's circumstantial evidence theory. Under this approach, Plaintiff "must first make out a prima facie case of discrimination by showing 1) that [she] was a member of a protected class; 2) that [she] was discharged; 3) that [she] was qualified for the position held; and 4) that [she] was replaced by someone outside of the protected class." *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012) (quotation marks omitted). Once a plaintiff has established her prima facie case, the burden "shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). "[T]o survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin*, 689 F.3d at 593 (quotation marks omitted). We hold, as explained below, that Plaintiff has established a prima facie case of race and sex discrimination and rebutted Defendants' non-discriminatory justification for her termination. Plaintiff's claim therefore survives Defendants' motion for summary judgment.

### A.    Plaintiff was replaced by someone outside of her protected class

The parties agree that Plaintiff has established the first three elements of her prima facie case. The question is whether Plaintiff was replaced by someone outside her protected class. Two people held the position of SORTA's CEO in the aftermath of Plaintiff's termination. First, Hock acted as interim CEO for a short period of time. SORTA then selected Crews, an Hispanic woman, to serve as Plaintiff's permanent replacement. Looking only at Plaintiff's permanent replacement, we hold that Plaintiff has met this fourth element of her prima facie case.

At a minimum, Plaintiff satisfied this element of her prima facie claim of race discrimination. The record before us is sparse, but both parties agree that Plaintiff is African American and Crews is Hispanic. Absent more extensive evidence on the subject, these two facts are enough to establish that Plaintiff was replaced by someone

outside her protected racial class. *See Hill v. Forum Health*, 167 F. App'x 448, 453 (6th Cir. 2006) ("Whether [the person promoted over the African American plaintiff] is Caucasian or of Native-American descent, the fact remains she is not a member of the same protected class as [the plaintiff] . . . [and] undisputedly not African-American . . . ."); *cf. Nixon v. Kent Cnty.*, 76 F.3d 1381, 1384, 1386–87 (6th Cir. 1996) (en banc) (holding that African Americans and Hispanics could not be coalesced to show a violation of § 2 of the Voting Rights Act).

Moving to Plaintiff's sex discrimination claim, we find that it cannot be untangled from her claim for race discrimination. Naturally, "where two bases of discrimination exist, the two grounds cannot be neatly reduced to distinct components." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). The Supreme Court has acknowledged this truism and held that a plaintiff can maintain a claim for discrimination on the basis of a protected classification considered in combination with another factor. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (per curiam). In many of these so-called "sex-plus" cases, the plaintiff's subclass combines a characteristic protected by Title VII with one that is not. *See id.* We have therefore required sex-plus plaintiffs to show unfavorable treatment as compared to a matching subcategory of the opposite sex. *See Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 438–39 & n.8 (6th Cir. 2004).

In the case now before us, both classifications—race and sex—are protected by Title VII. These characteristics do not exist in isolation. African American women are subjected to unique stereotypes that neither African American men nor white women must endure. *Cf. Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1562 (9th Cir. 1994) (discussing sex-and-race Title VII claim brought by Asian woman). And Title VII does not permit plaintiffs to fall between two stools when their claim rests on multiple protected grounds. Thus in *Hafford v. Seidner*, 183 F.3d 506 (6th Cir. 1999), we held that a plaintiff could rely on evidence of religious harassment to buttress his claim for racial harassment, even though the religious harassment claim could not survive

independently.  *See id.* at 514–15; *see also Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416–17 (10th Cir. 1987).

Title VII prohibits discrimination on the basis of race *or* sex.  *See* 42 U.S.C. § 2000e-2(a)(1).  "The use of the word 'or' evidences Congress' intent to prohibit employment discrimination based on any or all of the listed characteristics." *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980);[2] *cf. N.Y. Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 61–63 (1980) (discussing the effect of broad, disjunctive wording in Title VII).  The House even rejected an amendment that would have modified the protected classification of sex with the word "solely." *See Jefferies*, 615 F.2d at 1032 (citing 110 Cong. Rec. 2728 (1964)).  If a female African American plaintiff (for example) establishes a sufficient foundation of discrimination, a defendant cannot undermine her prima facie case by showing that white women and African American men received the same treatment. *See id.* at 1032–33; *see also Gorzynski*, 596 F.3d at 109–10.  The realities of the workplace, let alone the purpose of Title VII, will not allow such an artificial approach. *See Vance*, 133 S. Ct. at 2452 (explaining how the Court's rule conformed to the realities of the modern workplace).  Plaintiff has established a prima facie claim for race discrimination.  She has also proffered evidence supporting a claim of sex discrimination, in the form of the distasteful e-mails of PTM executives.  These e-mails might not support a direct evidence claim for sex discrimination—as we explained earlier, we need not rule on this complex issue.  But considered as a whole, Plaintiff has satisfied her prima facie burden on a claim of discrimination on the basis of race and sex.[3]

Defendants assert that it is unwieldy in this case to ask whether Plaintiff was replaced by someone outside her protected class.  The relevant question, Defendants urge, should be whether similarly situated, non-protected individuals were treated better.

---

[2]The Supreme Court cited *Jeffries* with approval in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 n.10 (1999).

[3]Our conclusion means that we have no need to consider Plaintiff's theory that she was discriminated on the basis of her status as a single mother, or her argument that we should deem Hock to be her replacement for the purposes of her prima facie case.

We disagree.   The mode of proof that Defendants suggest is intended to provide plaintiffs with an alternative way of establishing the final element of their prima facie case.  *See Talley*, 61 F.3d at 1246.  This method is especially useful in cases where the plaintiff is not terminated, is not replaced, or is not replaced with a single person.  *See Clayton v. Meijer, Inc.*, 281 F.3d 605, 608–10 (6th Cir. 2002); *see also Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 704–05 (6th Cir. 2007).  But the replacement method works especially well when a plaintiff is terminated and the employer hires a single replacement to do the same job.  That is precisely what happened in this case.  SORTA had and continues to have just one CEO.  Before August 2010, that was Plaintiff.  Three months later, it was Crews.  Defendants point out that they suggested four candidates to replace Plaintiff, and SORTA made the final decision to hire Crews.  But Defendants do not argue that Plaintiff was "replaced" by these four candidates collectively.  The factfinder will be free to consider the input SORTA had into the decision to hire Crews. We need not belabor this issue for the purposes of summary judgment.

### B.       Plaintiff has rebutted Defendants' non-discriminatory explanation

Since Plaintiff has established her prima facie case, the burden is on Defendants to proffer a legitimate, nondiscriminatory justification for her termination.  *See Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013).   Defendants have offered the explanation that Hock apparently believed that Plaintiff had lied to SORTA Board members.  This explanation satisfies Defendants' burden.  *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 854 (D.C. Cir. 2006).  The onus therefore shifts back to Plaintiff to rebut this justification by showing it was pretextual.  *See Chen*, 580 F.3d at 400.  Plaintiff can do this "by showing (1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate [her termination], or (3) that they were *insufficient* to motivate discharge."  *Chattman*, 686 F.3d at 349 (quotation marks omitted).   Plaintiff has opted for the first route, meaning she must show that "the proffered bases for [her] discharge never happened."  *Id.* (quotation marks omitted).  In other words, Plaintiff must establish a genuine issue of fact as to whether her statements were lies.

According to Hock's sworn testimony, he relied on two purported lies by Plaintiff when he decided to fire her:  (1) Plaintiff's statement to the Board that Hock was unavailable to consult with SORTA concerning the union organization effort in the summer of 2010, and (2) Plaintiff's representation that her staff, not Plaintiff herself, made the decision to hire MPI to consult on this union issue.  We cannot say, based upon the available evidence, that either of these statements was clearly untrue.

As for the first purported lie, Plaintiff testified that Hock told her on the phone that he was unavailable to consult with SORTA.  E-mails from June 2010 show that Hock was in fact busy working on union issues in Tucson, Arizona.  Plaintiff's statement to the Board that she was informally consulting with Hock also finds some support in the record.  Plaintiff asked Hock for a proposal for training on labor relations and Hock responded with one.  Hock did testify that Plaintiff's statements were nevertheless false—that he was available to consult with SORTA.  A jury can consider Hock's and Plaintiff's credibility and weigh the evidence accordingly.  We cannot.  The documentary record establishes a genuine factual issue concerning the truthfulness of Plaintiff's first alleged lie.

Hock also relied on Plaintiff's purported dissimulation about the retention of MPI.  Plaintiff testified that she had no part to play in this choice.  But according to Hock, Bill Desmond, SORTA's general counsel, reported that Plaintiff had been involved in the decision to hire MPI.  There is just one problem with Defendants' version of events—it relies on inadmissible hearsay.  Admittedly, parties are not required to submit evidence in a motion for summary judgment in a "form that would be admissible at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  However, the substance must still comport with the rules of evidence, including the rules on hearsay.  *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007).  Defendants offer Hock's account of Desmond's statement to prove that Plaintiff was in fact involved in the decision to hire MPI—in other words, to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(c)(2).  Desmond's account might be admissible to show the extent of Hock's investigation.  *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598

(6th Cir. 2007). But Defendants cannot use these statements for their truth in a motion for summary judgment any more than they could use them at trial. *See Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 619–20 (6th Cir. 2003). Stripped of Desmond's statements, the record concerning this second lie is little more than a he-said, she-said. Plaintiff's sworn testimony that she did not have a role in the retention of MPI is enough to create a genuine issue of fact.

Defendants have highlighted Plaintiff's assertion in her complaint that the contract dispute between her and PTM was a root cause of her termination. Defendants argue that Plaintiff's own position shows that Hock had good cause to fire her. Perhaps Hock relied on the turmoil surrounding the contract renewal when he decided to terminate Plaintiff. If so, he did not reveal this motivation for Plaintiff's firing in his sworn deposition testimony. Hock testified that he based his decision on Plaintiff's two lies. He did mention other "ancillary reasons" for terminating Plaintiff, including perceived poor morale at SORTA and financial problems, but he made clear "the reason, like I said earlier, that I terminated her was because of the lies she had made to me." (R. 46-1, Hock Dep., at 523–24.) Plaintiff has therefore established a genuine issue of fact concerning the truthfulness of her two purported lies.

### C.     The honest belief doctrine does not apply

Even though Plaintiff has established pretext, Defendants may still be entitled to summary judgment based on the "honest belief" doctrine. "If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009). "The key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009) (quotation marks omitted).

Hock's investigation into Plaintiff's two purported lies consisted of speaking with one person, Desmond, about the retention of MPI. Perhaps this single interview could satisfy the requirement that the investigation turn up particularized facts if Hock had fired Plaintiff for overt misconduct. *See Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 740–41, 743 (6th Cir. 2012). But Hock fired Plaintiff for lying—not just uttering a falsehood, but doing so "with intent to deceive." Webster's Third New Int'l Dictionary 1305 (1993). One conversation did not establish sufficient particularized facts about the truth behind Plaintiff's statements, let alone her motive. Defendants have therefore failed to establish a foundation for the honest belief doctrine to apply.

## CONCLUSION

For the reasons we have explained, we **REVERSE** the district court's grant of summary judgment in favor of Defendants and **REMAND** for further proceedings consistent with this opinion.