**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 19a0035n.06

Case No. 18-3378

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Jan 23, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOSEPH HARDESTY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| KROGER COMPANY; KROGER G.O., | ) | OHIO |
| LLC, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: CLAY, COOK, and LARSEN, Circuit Judges.

COOK, Circuit Judge. After Kroger fired Joseph Hardesty, a fifty-year-old white male, he sued the company for race and sex discrimination under Title VII, 42 U.S.C. § 2000e *et seq.*, and age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, and an analogous Ohio law, Ohio Rev. Code Ann. § 4112.02. The district court granted Kroger summary judgment, finding that Hardesty failed to rebut as pretext the company's proffered legitimate reason for terminating his employment. For the reasons that follow, we affirm.

**I.**

Hardesty worked as a "mass hire" recruiter for Kroger's Center of Recruiting Excellence. When a newly-opened Kroger supermarket needs to fill a substantial number of its entry-level

positions, these recruiters screen applications from job candidates and schedule interviews over the phone.

About six months into Hardesty's tenure at Kroger, Briana Whitlow, one of Hardesty's coworkers, reported that she walked by Hardesty's desk one day, saw his phone system light up to reflect an inbound call, and observed him decline (or "release") it in favor of finishing a conversation with fellow recruiter Aretha O'Aku. Whitlow mentioned the incident to her supervisor, Daniele Williams, and then followed up with a formal email complaint detailing her allegation this way:

> As I was speaking with Carly about scheduling a candidate, I noticed Joe was releasing calls (hanging up on candidates) that were coming through to his phone while he was in mid conversation with Aretha. I just wanted to inform you. This was roughly between 3:15pm and 3:30pm today. Thanks!

R. 57-11, PageID 2876.

Even though Kroger recruiters work in a call center, they, like in-store employees, must comply with Kroger's "customer first" policy, treating job candidates as if they were ordinary customers and providing them with exceptional service. Accordingly, Whitlow's information got Williams's attention. Williams first requisitioned Hardesty's call logs, but learned that Kroger's system could not retrieve data on individual calls, only a recruiter's daily averages, and therefore could not conclusively verify whether he declined an incoming call. Still, Williams gathered and reviewed several reports detailing the average call times for Hardesty, the mass hire team generally, and the entire Center for Recruiting Excellence.

Upon analyzing the data, Williams concluded that Hardesty posted "considerably" shorter call times as compared to the rest of his team—"an average talk time of 1 min and 46 seconds" where his team averaged 5 minutes. Williams met with Hardesty, asking whether he had been experiencing problems with his phones, or could otherwise explain the anomaly. He responded

that he was not having any phone issues (though his phone had occasionally dropped calls in the past) and that he just spoke more quickly than his peers. The interview did not assuage Williams's concerns, instead reaffirming her conviction that Hardesty wasn't properly screening job applicants. Around the same time, Williams spoke with O'Aku, who hadn't noticed the incident and therefore could not corroborate Whitlow's accusation.

Williams then consulted with her manager, Rana Schiff, and her partner in human resources to discuss Whitlow's report and the status of her investigation. In an email to human resources, Williams stated that Whitlow saw Hardesty release at least "three calls," and recommended termination because Kroger brooks "no tolerance for [its] recruiters to hang up on customers." Human resources agreed. Williams spoke with Schiff one last time to report her findings and verify that she'd covered her bases.

The following week, Williams met with Hardesty, confronted him with the accusations and her research, and offered him the choice to resign rather than be terminated. Hardesty chose to personally speak both with Schiff and the director of the recruiting center—each of whom reviewed even more granular phone data before concluding that Hardesty had likely hung up on an incoming call and could not remain at Kroger—before he chose termination. This suit followed.

The district court granted Kroger's motion for summary judgment, finding that Hardesty failed to satisfy his burden to produce evidence showing that Kroger fired him because he was white, male, or fifty. He appeals.

**II.**

"We review a district court's grant of summary judgment de novo," *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007), viewing the entire record in a light most favorable to the party opposing summary judgement and drawing all reasonable inferences in that

party's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An entry of summary judgment stands only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

When a plaintiff cannot produce direct evidence of employment discrimination, *McDonnell Douglas* requires analyzing from a three-part framework whether the plaintiff's claims should survive summary judgment. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). A plaintiff must first make out a prima facie case of discrimination. Then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. If the employer does so, the plaintiff prevails only if he proves "either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [the plaintiff's] discharge, or (3) that they were *insufficient* to motivate discharge." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quotation omitted). No matter the path chosen, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the employer's] explanation and infer" intentional discrimination. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (internal quotation omitted).

One catch. We evaluate an employer's *intent* in discrimination suits. Thus, if an employer "honestly believes" its proffered nondiscriminatory reason, we do not infer pretext just because the reason proves "mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). "In other words, arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*." *Id.* (internal quotations omitted). A belief is honestly held so long as the employer can "establish its reasonable reliance on the

particularized facts that were before it at the time the decision was made." *Id.* at 807. The employee must then produce "proof to the contrary" that challenges the foundation of the employer's belief or lose on summary judgment. *Id.*; *see also Braithwaite*, 258 F.3d at 494.

## III.

Neither party contests that Hardesty established a prima facie case of age, race, and sex discrimination under *McDonnell Douglas*'s burden-shifting framework. Nor do they dispute that Kroger presented a legitimate, nondiscriminatory reason for terminating Hardesty—namely, his violation of Kroger's customer first policy. Instead, Hardesty chiefly takes issue with the district court's decision to credit Kroger's "honest belief" in its nondiscriminatory reason and to conclude that Hardesty failed to raise a genuine issue of material fact as to whether Kroger's rationale served as pretext. Hardesty argues both that Williams did not subjectively believe that Hardesty released incoming calls and did not perform an objectively reasonable investigation. These arguments fail.

Hardesty describes how Williams incorrectly relayed that Whitlow reported at least *three* dropped calls rather than just two[1] in her email to human resources where she explained that she already "believe[d] a termination should occur," and claims that these "lies" about the number of released calls create a genuine issue of material fact and show that her reason was pretextual. But these inconsistences do not prove that Williams did not subjectively believe her proffered rationale—that he had violated the customer first policy. Hardesty's own briefing in response to Kroger's motion for summary judgment acknowledges that during his termination, Williams explained that he had been accused of releasing only one inbound call. Declining even one such call constitutes a violation of Kroger's customer first policy and warrants termination. And though

---

[1] Whitlow's email states that she observed Hardesty "releasing calls," not "releasing at least three calls." Reading this in a light most favorable to Hardesty, as we must, attention to grammatical conventions suggests that Whitlow meant at least two calls.

she asked human resources for advice, any miscommunication there does not change the result; Williams retained full authority to terminate Hardesty's employment and already suspected that she ought to fire him.

Hardesty claims that Williams again lied when she failed to document that O'Aku couldn't corroborate Whitlow's accusation. These lies, Hardesty explains, evince bad faith and a consciousness of guilt sufficient to create a genuine issue of material fact. This point is not well taken. Even assuming that O'Aku's inability to corroborate the accusation can be fairly read to refute it, investigations often produce conflicting evidence, requiring an employer to evaluate credibility and weigh various pieces of information. Just because an employer must choose between inconsistent accounts "does not mean that there inevitably is a genuine issue of fact concerning the employer's good faith." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 417 (8th Cir. 2010). And again, Williams need not have mentioned any of her findings to human resources at all. Hardesty ultimately asks us to infer that Williams lied because she did not honestly believe that he had declined an incoming call. Summary judgment "does not allow, much less require that we draw [such] strained and unreasonable inferences in favor of the nonmovant." *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006) (quotation omitted).

Attacking Williams for relying on call length data likewise does nothing for Hardesty's argument. Williams testified that she knew the phone logs could not directly substantiate Whitlow's account, but she believed exceptionally short call times could reflect a pattern of dishonest behavior and reveal a practice of failing to properly screen applicants or disconnecting calls. After digesting the records and Hardesty's unsatisfying explanation that he simply talked faster than his peers, she concluded that Whitlow's account rang true. Further, Hardesty's reference to a confusing, out-of-context statement in Williams's deposition also cannot create a

genuine issue of material fact. *See* R. 30, PageID 605 ("At [the] time [that I was terminating Hardesty] I don't know if I could say I believed him or I didn't. I listened to what he was saying."). Williams's stating that she couldn't remember what she was thinking while listening to Hardesty deny releasing any calls also does not prove that she didn't believe he had. The record reflects numerous places where Williams expressed that she trusted Whitlow's account well before and well after discussing the accusations with Hardesty.

Nor does this "evidence" prove that Williams did not reasonably rely on the information she'd gathered when deciding that Hardesty's actions violated Kroger's customer first policy and warranted termination. Could she have done more to determine whether Whitlow actually observed Hardesty releasing calls? Tracked down surveillance footage to confirm that Whitlow walked by Hardesty's cubicle that afternoon? Perhaps. But when we evaluate the honesty of an employer's belief, we do not require evidence of an optimal decisional process or a scorched-earth investigation. *Smith*, 155 F.3d at 807. "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

Hardesty's own submissions document how completely Williams investigated the issue. She spoke to all potential witnesses, scrutinized Hardesty's call logs for any suspicious patterns, sought advice from her colleagues in human resources and operations, and met with Hardesty to clarify why his logs reflected such short phone calls as compared to his team's average. After reviewing all the data she believed available, she concluded that Hardesty likely released at least one incoming call and determined that this warranted immediate termination. "That [Hardesty] or the court might have come to a different conclusion if they had conducted the investigation is immaterial." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 287 (6th Cir. 2012). He has offered no evidence proving this decisional process "unworthy of credence," *Wright v. Murray Guard,*

*Inc.*, 455 F.3d 702, 708 (6th Cir. 2006), and our cases instruct that this level of diligence suffices, *see, e.g*, *Seeger*, 681 F.3d at 286 (affirming summary judgment for employer who fired an employee over alleged disability fraud when eyewitnesses saw the plaintiff with a herniated disk walking without pain for a short distance where other witnesses disagreed and even plaintiff's doctor attested that similarly disabled patients who cannot work a full eight-hour day could walk comfortably for an hour and a half ); *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 597 (6th Cir. 2014) (affirming grant of summary judgment where only one of two inconsistent witness statements and an incident report corroborated allegations against employee); *cf. Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 960 (6th Cir. 2014) (noting that an investigation where an employer interviews only one witness could turn up particularized facts sufficient to decide an employee engaged in misconduct); *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 654 (6th Cir. 2015) (reversing grant of summary judgment where the employer conducts no investigation).

Finally, even accepting the results of Williams's investigation, Hardesty claims that his alleged misconduct did not warrant termination. He argues that similarly situated employees were not terminated, Kroger ignored its own routine disciplinary policies when it chose to fire him, and Williams should not have terminated his employment because of one unfounded complaint. To be similarly situated, "the plaintiff and his proposed comparator must have engaged in acts of *comparable seriousness*." *Wright*, 455 F.3d at 710 (internal quotations omitted). But here, the comparator was not "similarly situated" because management did not believe that her actions violated company policy or warranted punitive action.

Challenging Kroger's interpretation of its own disciplinary guidelines also does not create a genuine issue of material fact regarding pretext. The Kroger policy notes that, "[g]enerally,

routine problems with an office associate are discussed and corrected on a day to day basis." Hardesty argues that because Kroger's policy does not define "routine," a jury should evaluate it and determine whether Williams ought to have first discussed and corrected his behavior before firing him. Kroger, on the other hand, contests that hanging up on a customer presents non-routine difficulties where the general policy does not apply. Not a single Kroger employee involved in Williams's investigation ever questioned whether hanging up on a customer merited termination. And "disputes about the interpretation of company policy do not typically create genuine issues of material fact regarding whether a company's stated reason for an adverse employment action is only a pretext designed to mask unlawful discrimination." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558–59 (6th Cir. 2009); *see also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008).

Finally, though Hardesty protests that his firing was unfounded and unfair, a court does not sit as a "super-personnel department," second-guessing management decisions. *Krenik v. County of Le Suer*, 47 F.3d 953, 960 (8th Cir. 1995) (quotation omitted); *see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) ("[I]t is inappropriate for the judiciary to substitute its judgment for that of management."). In other words, though some might think Hardesty's punishment too severe, Kroger can implement as strict a disciplinary policy as it wants so long as it doesn't weaponize that policy as pretext for discrimination. Without well-grounded evidence of pretext, Hardesty's claim must fail.

**IV.**

Hardesty did not carry his burden under *McDonnell Douglas* of proving that Kroger's proffered nondiscriminatory reason for firing him was pretextual. Thus, the district court did not err in granting Kroger's motion for summary judgment. We AFFIRM.