Zoya MINEVICH, Plaintiff,

v.

SPECTRUM HEALTH–MEIER HEART CENTER, Darryl Elmouchi, Anne Beekman, and Rick Green, Defendants.

No. 1:12–cv–1358.

United States District Court,
W.D. Michigan,
Southern Division.

Signed March 6, 2014.

794

Ronnie Edward Cromer, Jr., The Cromer Law Group PLLC, Southfield, MI, for Plaintiff.

Sara Grey Lachman, Thomas R. Wurst, Miller Johnson PLC, Grand Rapids, MI, for Defendants.

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PAUL L. MALONEY, Chief Judge.

This matter is before the court on Defendants' motion for summary judgment. (ECF No. 85.) In this case, Plaintiff Zoya Minevich, a Ukrainian woman, asserts that she was subject to discrimination and retaliation based on her national origin and gender while she was employed at Spectrum. In her complaint, Plaintiff alleges seven counts: gender discrimination, hostile work environment, and retaliation under Title VII; hostile work environment under Michigan's Elliott–Larsen Civil Rights Act; negligence; intentional infliction of emotional distress; and wrongful discharge. Defendants Spectrum Health–Meijer Heart Center [1] ("Spectrum"), Dr.

---

1. The record consistently refers to the Meier Heart Center. However, the Court assumes the proper Defendant is the Meijer Heart Center. *See Fred and Lena Meijer Heart Center,* SpectrumHealth.org (February 20, 2014, 2:50 PM), http://www.spectrumhealth.org/body_locations.cfm?id=638&action=detail&ref=1811.

Darryl Elmouchi, Anne Beekman, and Rick Green brought the instant motion for summary judgment. They allege that Plaintiff's state law claims are barred by a shortened statute of limitations and that they are entitled to judgment as a matter of law on her hostile work environment, discrimination, and retaliation claims.

Having reviewed the briefing and relevant legal authority, the Court finds the matter can be resolved without oral argument. *See* W.D. Mich. L.R. Civ. P. 7.2(d). For the following reasons, the Court will **GRANT IN PART AND DENY IN PART** the Defendants' motion.

## I. BACKGROUND

Plaintiff Minevich was hired at Spectrum on November 30, 2009 as a cardiovascular technologist (CVT), assisting surgeons in surgical procedures. (ECF No. 117 at pg. 10.) During her employment, Plaintiff was the only female CVT. (*Id.* at 11.) Plaintiff worked with three preceptors, or trainers, who were more experienced CVTs: Girum Melka, Derek Bullen, and Matt Jackson. (*Id.*) Plaintiff worked with multiple surgeons, including Dr. Elmouchi, one of the defendants here. (*Id.*) Plaintiff's supervisor was Defendant Anne Beekman. (ECF No. 98 at pg. 8.) The human resources department included Defendant Rick Green.

Plaintiff's performance and treatment during the 26 months she was an employee at Spectrum is subject to much debate by the parties. Defendants characterize Plaintiff as inept, slow to learn, and hazardous to patient safety, while Plaintiff claims that the incidents calling her competency into question were largely unsubstantiated and arose only after she began complaining about racial and gender harassment. Each party's version of the facts is presented below.

Defendants assert that Plaintiff failed to learn the skills necessary for the CVT job, even after an extended training time. (ECF No. 98 at 9–10.) They claim that Plaintiff was unable to work independently during heart surgeries to operate the simulator, take measurements of EKG intervals, operate the V–Tech equipment, or operate the defibrillator. (*Id.* at 10.) Defendants also claim that Plaintiff did not maintain the sterile technique required in surgery rooms, once opening a bag of sterile instruments with her teeth. (*Id.* at 11.) In July 2010, Defendant Beekman issued a "Corrective Action Second Written Warning" (ECF No. 89–4) to Minevich after two patients contracted infections. Both patients had undergone surgeries at which Minevich was responsible for keeping the area sterile, but Minevich could not be definitively proven as the cause of the infections. (ECF No. 98 at 11.) Minevich contested the warning, complaining that, inter alia, the hospital's suspicion that she caused the infections was retaliation for her prior complaints about Elmouchi yelling at her during surgeries. (*Id.*; ECF No. 89–5.) Defendant and HR employee Rick Green investigated this claim, but could not substantiate the allegation. (ECF No. 90–1.) In October 2011, Minevich was involved in an altercation with a nurse, Jody Hunt, that was witnessed by Kim Umlor, another RN. (ECF No. 98 at 11.) After the altercation was reported to Defendant Beekman, both Minevich and Hunt were disciplined. (*Id.*; ECF No. 21) Defendants claim that immediately after that, Plaintiff falsely reported that Umlor was drunk on the job. (ECF No. 98 at 11.)

Defendants claim that Minevich continued to exhibit substandard performance, routinely making mistakes, causing problems for others on her teams, and endangering patient safety. (*Id.* at 12; ECF Nos. 92–1, 92–2.) Finally, on December 5, 2011, the director of the Frederick Meijer Heart and Vascular Institute, Patricia Vil-

lemure, composed a memo stating that Minevich had to be terminated due to her inability to perform the job satisfactorily. (ECF No. 91–3.) Accordingly, Beekman put Minevich on "Decision Making Leave" on December 15 for three days. (ECF No. 91–5). When Plaintiff returned to work on December 19, 2011, Beekman created a "Return to Work Agreement" and a "Performance Enhancement Plan" (PEP). (*Id.*) Under the PEP, Minevich had varying amounts of time to master the basic skills of a CVT, and she was to be reviewed periodically for progress. (*Id.*)

On January 19, 2012, Plaintiff filed a formal complaint alleging that she had been subject to discrimination based on gender and race. In her complaint, she listed a number of incidents implicating seven of her coworkers. (ECF No. 93–2.) Concerning her nationality, Plaintiff alleged that other CVTs called her "Natasha" after the character on the Rocky & Bullwinkle Show, started a rumor that she was a "mail order bride," and made fun of her accent. (*Id.*) Plaintiff reported that Elmouchi yelled at her during a procedure, and Beekman suggested that she was the only one treated harshly because she was the only woman. (*Id.*) Plaintiff also reported that her coworkers engaged in a number of sexual jokes and double entendres, such as naming a piece of tubing after porn star John Holmes, taking about giving their wives "pearl necklaces," joking about the pronunciation of the name Koch–Remage, comparing Minevich's breasts to a woman in a lab training video, and asking Minevich if she wanted to see another CVT's penis piercing. (*Id.*) Placing her termination on hold, Spectrum began an investigation into Plaintiff's harassment allegations. However, no evidence of harassment or discrimination was uncovered. (ECF No. 93–5; ECF No. 98 at 14.) Finally, on February 2, 2012, Minevich's employment was terminated. The termination notice stated that Minevich could not demonstrate "the ability to perform the expectations of [her] position at a satisfactory level." (ECF No. 94–4.)

Plaintiff presents a very different picture of her employment at Spectrum. Overall, she alleges that the complaints about her performance were brought by her harassers, in retaliation for her complaints against them. Plaintiff alleges that she began complaining to management about the abusive work environment around March 2010. She filed a formal complaint against Elmouchi on June 4, 2010. (ECF No. 127–1 at pg. 5–6.) Around July 2010, Minevich was blamed and disciplined after two patients were infected during surgical procedures. Plaintiff claims that many CVTs and nurses did a substandard job at cleaning the surgical rooms, and that there was no proof that Plaintiff was the cause of the infections. (ECF No. 117 at pg. 13.) Discovery in this case revealed that another employee was also present at both procedures and could have caused the infections-the attending doctor. (ECF No. 123–4.) Further, she alleges that all of the information against her came from her harassers, and an inadequate investigation was done. (*Id.*)

In September 2010, Plaintiff was denied the opportunity to attend training on certain equipment, but a male technician with less seniority than Minevich was allowed to attend. (ECF No. 117 at pg. 12.) Plaintiff also recounts a number of sexual jokes and innuendo that made her uncomfortable, which she said happened nearly every day. (ECF No. 118–4 at pg. 6; ECF No. 93–2 ("harassment at the lab continued almost on a regular bas[is].")) She claims that Elmouchi was the "ringleader" in some of the jokes, and that Elmouchi, Green, and Beekman fostered an environment where sexual jokes were acceptable. (*Id.*) She alleges that vulgar photographs

of male genitals were displayed on a board in one of the labs, and Beekman was involved in posting the photos. (*Id.*) She also described the "pearl necklace," Koch–Remage, penis piercing, "John Holmes," and Russian jokes incidents discussed above. Plaintiff describes Elmouchi screaming at her but calmly explaining the same problems to men, refusing to explain his procedures or provide direction to her, and not disciplining men for mistakes. (ECF No. 120–2 at pg. 4.) Other CVTs commented that "women have small brains" so they are not qualified for the CVT job. (ECF No. 119–4 at pg. 7.) After reporting stress from harassment at work to a mental health professional, Plaintiff received a prescription to control anxiety and depression. (ECF No. 128–2 at pg. 3.) Despite her complaints about each of these incidents, Spectrum deemed each claim unsubstantiated. (ECF No. 127–4 at pg. 4.)

Plaintiff also outlines a number of abuses to both other women and minorities at Spectrum. One CVT pulled the drawstring on another woman's pants so that the woman had to catch them from falling down. (ECF No. 119–3 at pg. 9–10.) Another man intentionally kicked a chair into the same woman's buttocks on another occasion. (ECF No. 123–5 at pg. 2.) This woman was told that "bad things happen" when people file complaints, and she ultimately left her job after complaining to Spectrum about the hostile work environment towards women at the Heart Center. (*Id.* at pg. 3–4; *see* ECF Nos. 109–3 at 7; 109–4.) Likewise, Plaintiff recounts harassment directed at Girum Melka, who is black. She claims other workers called him a "nigger" and joked that he needed to wash his hands more because he is black, and he was told he was invited to meetings to be the token minority. (ECF No. 117 at pg. 17.)

Plaintiff claims that the decision to terminate her was made on December 5,

2011, when Villemure pledged to terminate Plaintiff in a memo. (ECF No. 91–3.) She alleges that her termination was in large part due to extreme pressure from Elmouchi. (ECF No. 117 at pg. 24–25.) Based on a complaint from Elmouchi, Plaintiff was sent home for three days on December 15, 2011. (ECF No. 91–5.) She claims Elmouchi's complaint was based on her inability to run the defibrillator, but defibrillation was the nurse's responsibility and not a job CVTs were expected to perform. (ECF No. 117 at pg. 12.) When she returned from the short leave, she was placed on an eight week probation plan (PEP) and told that any mistake during this period could result in termination. (ECF No. 120–3 at pg. 5.)

On January 19, 2012, Plaintiff filed formal complaints of gender and national origin discrimination, retaliation, sexual harassment, and hostile work environment with Spectrum. (ECF No. 126–1.) Spectrum conducted an "investigation" by interviewing those involved in the alleged harassment, but found no basis for the complaints. (ECF No. 93–5.) Less than two weeks after filing her complaints, on February 1, 2012 Plaintiff was terminated. Plaintiff later filed an EEOC complaint on the same grounds (ECF No. 127–2 at pg. 8) and received a right-to-sue letter around September 12, 2012 (*Id.* at pg. 10).

Minevich brought the instant lawsuit on December 12, 2012. (ECF No. 1.) In her second amended complaint, she alleges seven causes of action: (1) gender discrimination under Title VII; (2) negligence; (3) intentional infliction of emotional distress; (4) wrongful discharge; (5) hostile work environment under Title VII; (6) hostile work environment under Michigan's Elliott–Larsen Civil Rights Act; and (7) retaliation under Title VII. (ECF No. 51.) Defendants filed the instant motion for

summary judgment on November 1, 2013. (ECF No. 85.)

## II. LEGAL FRAMEWORK

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir.2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. 2505. The function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Resolution Trust Corp. v. Myers*, 9 F.3d 1548 (6th Cir.1993) (*citing Anderson*, 477 U.S. at 249, 106 S.Ct. 2505).

## III. ANALYSIS

### A. MICHIGAN STATE LAW CLAIMS

Defendants claim that Minevich's state law claims are time barred. They argue that Plaintiff agreed to a shortened six-month, 180 day, period of limitations on all employment claims in her 2009 employment application and 2010 annual performance evaluation. This lawsuit was filed more than ten months after Plaintiff's termination. Plaintiff responds that the shortened limitations period does not apply because there was no consideration for the employment agreement. She notes that Spectrum agreed only to give Plaintiff a wage increase if it determined that she was eligible—an illusory promise available to all employees. Defendants contend that there was valid consideration: the employment offer.

The application for employment Plaintiff submitted to Spectrum contained a section headed by the instruction: "Read Carefully and Sign If You Agree To:"

> I agree that I will not commence any action or lawsuit relating to my employment or application for employment with Spectrum Health more than six months after the employment action that is the subject of the action or lawsuit, and I agree to waive any statute of limitations to the contrary. I understand that this means that even if the law would give me the right to wait a longer time to make a claim, I am freely and knowingly waiving that right, and that any claims not brought within six months after the relevant employment action will be barred.

(ECF No. 94–5 at pg. 5–6.) The application was signed by Plaintiff on October 6, 2009. Similarly, Plaintiff's Annual Performance Evaluation contained a paragraph which read:

As a condition of my continued employment, and in consideration for my eligibility for an annual wage increase, I agree that any lawsuit against Spectrum Health and/or its agents or affiliates arising out of my employment or termination of employment, including but not limited to claims arising under state or federal civil rights statutes, must be brought within the following time limits or be forever barred: (a) for lawsuits requiring a Notice of Right to Sue from the EEOC, within 90 days after the EEOC issues that Notice; or (b) for all other lawsuits, within (i) 180 days of the event(s) giving rise to the claim, or (ii) the time limit specified by statute, whichever is shorter. I waive any statute of limitations that exceeds this time limit.

(ECF No. 95–2 at pg. 10.) This document was signed by Plaintiff on April 19, 2010.

 There is no dispute that parties to a contract can shorten limitations periods in employment agreements. *Myers v. Western–Southern Life Ins. Co.*, 849 F.2d 259 (6th Cir.1988). Such agreements are upheld if the shortened time period does not violate another law or detrimentally impact public policy interests. *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 703 N.W.2d 23 (2005). Plaintiff does not allege that the limitation period is illegal or contrary to public policy; her only challenge to the shortened period of limitation is lack of consideration. Like any other contract, employment contracts require (1) competent parties, (2) proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Detroit Trust Co. v. Struggles*, 289 Mich. 595, 599, 286 N.W. 844 (1939). The Michigan Court of Appeals recognizes that the terms of an employment application are part of the contract of employment between the employee and employer. *Timko v. Oakwood Custom Coating, Inc.*, 244 Mich.App. 234, 244, 625 N.W.2d 101 (2001).

 Consideration is present when there is a "benefit on one side, or a detriment suffered, or a service done on the other." *Plastray Corp. v. Cole*, 324 Mich. 433, 440, 37 N.W.2d 162 (1949). There is no consideration if one party promises to do what it is already legally bound to do. *Yerkovich v. AAA*, 461 Mich. 732, 741, 610 N.W.2d 542 (2000). In the context of employment contracts, the employer provides consideration to support enforcement of the terms of the application by giving the employee employment and wages. *Timko*, 244 Mich.App. at 244, 625 N.W.2d 101; *Mendoza v. Gorno Ford ELC, L.L.C.*, No. 309663, 2013 WL 2096633 at *1 (Mich.App. May 14, 2013). Likewise, when a contract is renewed, the employee receives additional salary and employment as consideration. *See Lyman v. Greater Boston Radio, Inc.*, No. 09–14502, 2010 WL 2557831 at *9 (E.D.Mich June 21, 2010) (citing *Timko*, 244 Mich.App. 234, 625 N.W.2d 101). Where a plaintiff accepts the benefits of a renewed employment agreement, she cannot "selectively disclaim certain of its terms" later. *Id.*

 In the instant case, the terms of Plaintiff's 2009 application became part of her employment contract. *See Timko*, 244 Mich.App. at 244, 625 N.W.2d 101. Spectrum offered Plaintiff employment and wages, and Plaintiff accepted those benefits under the employment contract. The provision of employment and wages was sufficient consideration to bind Plaintiff to the terms of the employment contract. *See id.* Likewise, when Plaintiff signed the performance evaluation, effectively a contract renewal, she was provided with ongoing employment and wages. Spectrum was under no preexisting obligation to continue to employ Plaintiff or increase her wages, regardless of its internal policies or regular practices. Because Plaintiff accepted the benefits of the contract,

she cannot now selectively disclaim the term limiting her period of limitations. *See Lyman,* 2010 WL 2557831 at *9.

Accordingly, Plaintiff is bound by the time limits in those employment agreements. Minevich's claims requiring an EEOC letter had to be filed within 90 days of the issuance of a right-to-sue letter, and all other claims must have been brought within 180 days. Minevich was terminated on February 1, 2012, and brought this suit 315 days later, on December 12, 2012. Because the suit was filed more than 180 days after her termination, Plaintiff's state law claims are time barred. Thus, Claims II, III, IV, and VI are **DISMISSED.**

## B. TITLE VII

█ Plaintiff's remaining claims arise under Title VII of the Civil Rights Act, which makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. Minevich raises claims of hostile work environment, retaliation, and sex discrimination against Spectrum. Plaintiff also brings claims of retaliation against Elmouchi, Beekman, and Green. Although these Defendants did not argue this, employees and supervisors who do not otherwise qualify as "employers" cannot be held liable individually under Title VII. *Wathen v. Gen. Elec. Co.,* 115 F.3d 400, 404–05 (6th Cir.1997). Because Defendants Elmouchi, Beekman, and Green are not "employers" as defined by Title VII, 42 U.S.C. § 2000e(b), summary judgment is **GRANTED** in their favor. The claims against Spectrum are addressed below.

### 1. HOSTILE WORK ENVIRONMENT

█ To establish a prima facie case of hostile work environment, a plaintiff must show that (1) she was a member of a protected class, (2) she was subject to unwelcome sexual harassment, (3) the harassment was based on her status as a protected individual, (4) the harassment unreasonably interfered with the plaintiff's work performance by creating an intimidating, hostile, and offensive environment, and (5) the employer was liable for the harassing conduct. *Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 706 (6th Cir. 2007). Courts should consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Hafford v. Seidner,* 183 F.3d 506, 512 (1999) (quoting *Harris v. Forklift Sys.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The conduct must be both objectively and subjectively unacceptable: it must be "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id.* Mere teasing, offhand comments, and isolated incidents are not sufficient unless they are extremely serious. *Faragher v. Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). However, the "accumulated effect" of many instances that do not create a hostile environment on their own may be sufficient when taken together. *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 562 (6th Cir.1999). Severe or pervasive unequal treatment may also constitute a hostile work environment. *Id.* at 565. Overall, an environment is hostile when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 560.

The plaintiff must show that the employer "tolerated or condoned the situation" or "that the employer knew or should have known of the alleged conduct." *Id.* (citations omitted). An employer is vicariously liable for a "hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* at 659 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). An employer is also liable if it is negligent in handling coworker harassment. *Vance v. Ball State Univ.,* — U.S. ——, 133 S.Ct. 2434, 2441, 186 L.Ed.2d 565 (2013) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 789, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). That is, the employer is liable for "harassment of which it knew or should have known if it failed to take appropriate remedial action, *i.e.,* if its response manifests indifference or unreasonableness." *Gallagher v. C.H. Robinson Worldwide, Inc.,* 567 F.3d 263, 276 (6th Cir.2009).

Here, Defendants argue that the conduct was not severe or pervasive enough to constitute a hostile environment because Plaintiff only recounts a few stray offensive comments over two years. They cite a number of cases in which the court found that a single incident or a few incidents of sexual harassment were insufficient to establish a hostile work environment. *See Burnett v. Tyco Corp.,* 203 F.3d 980 (6th Cir.2000); *Bowman v. Shawnee State Univ.,* 220 F.3d 456 (6th Cir.2000); *Vermett v. Hough,* 627 F.Supp. 587 (W.D.Mich.1986); *Langlois v. McDonald's Rests. of Mich.,* 149 Mich.App. 309, 385 N.W.2d 778 (1986). Defendants also argue that because the sexual comments were not directed at Plaintiff, they carry less weight; that the evidence of national origin discrimination cannot support her gender discrimination claim; and that many of the incidents Plaintiff relies on were not sexual in nature or based on her gender,

so they do not support a hostile work environment claim.

Defendants' attempts to chip away at the evidence supporting Minevich's claims do not succeed. Contrary to Defendants' assertions, Plaintiff describes a number of sexual comments directed at her and involving her. Further, the Sixth Circuit has noted that "sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII." *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (1997). Also, Sixth Circuit case law "makes clear that the factfinder may consider similar acts of harassment of which a plaintiff becomes aware during the course of his or her employment, even if the harassing acts were directed at others or occurred outside of the plaintiff's presence." *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.,* 495 Fed.Appx. 651, 655 (6th Cir.2012) (citations omitted). Next, evidence of national origin harassment is relevant to hostile work environment claims based on gender. While not dispositive, those incidents contribute to the overall hostility of the working environment and are part of the totality of the circumstances the court should consider. Accordingly, the allegations of coworkers calling Plaintiff "Natasha," saying that she was a mail order bride, and mocking her accent support a largely sex-based hostile work environment claim. Finally, non-sexual conduct may be illegally sex-based and contribute to a hostile environment where "it 'evinces anti-female animus,'" even when it is not sexually explicit. *Williams,* 187 F.3d at 565 (holding that plaintiff must show only that, but for her sex, she would not have been subject to harassment). Here, Defendants argue that Plaintiff's allegations that she was screamed at, ostracized and setup for failure by male coworkers, and blamed for patients' medical issues were completely unrelated to her

gender and only mere unpleasantness at work. However, Plaintiff alleges that she, the only woman in her position, was singled out for this treatment because she was a woman, and her male colleagues were treated much differently. This is sufficient to link the events to Plaintiff's gender.

Overall, the facts in this case, taken in the light most favorable to Minevich, establish a genuine issue of material fact as to whether a hostile environment existed at Spectrum. While each incident viewed in isolation may not have been enough, the totality of the circumstances here provide sufficient proof of a hostile work environment. *See id.* at 563 (describing that incidents may "accumulate" to create an environment that is worse than the sum of its parts) (citations omitted). Plaintiff paints the picture of a male dominant workplace where women were considered unintelligent and treated more harshly for mistakes than men, where vulgar jokes and pornographic images made appearances frequently, and where women did not feel physically safe. She claims that harassment occurred nearly every day, and the record reflects that other women found the work environment to be unacceptable. *See Abeita v. Trans-America Mailings, Inc.,* 159 F.3d 246, 252 (6th Cir.1998) (finding evidence of hostile work environment because plaintiff alleged that harassing comments were commonplace and ongoing). Plaintiff's mental health records demonstrate that she subjectively perceived the environment to be hostile, and there is a question as to whether the stress she felt from her perceived harassment impacted her ability to do her job well. Accordingly, a jury could find that the incidents of gender-based harassment alleged by Plaintiff established a hostile work environment that effectively altered the conditions of Plaintiff's employment.

Next, Defendants argue that Minevich failed to provide any notice of harassment, so Spectrum cannot be held liable for the potentially hostile work environment. An employer is liable for a hostile work environment created by its employees if (1) the harasser is a supervisor, or (2) the harasser is a coworker and the employer was negligent in failing to stop the harassment. *Vance,* 133 S.Ct. at 2439. To determine if an employer was negligent, the test is "whether the employer 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.'" *Fleenor v. Hewitt Soap. Co.,* 81 F.3d 48, 50 (6th Cir.1996) (quoting *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 621 (1986)). If the plaintiff unreasonably failed to take advantage of a company policy against harassment, that weighs against imposing liability on the employer. *See Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 776 (1996). Spectrum has an anti-harassment policy that instructs employees to report harassment to their manager and human resources, or only human resources if the manager is the harasser. (ECF No. 96–2 at pg. 4.)

Plaintiff argues that Spectrum had notice of the harassment because it was pervasive, and because both Plaintiff and other women filed complaints against the same harassers. She claims that Spectrum was negligent in failing to stop the harassment for two years and by failing to conduct fair and unbiased investigations into the allegations of sexual harassment and assault it received. Defendants argue that Plaintiff alleges only a few incidents that do not constitute pervasive harassment, that Plaintiff waited too long to complain because the decision to fire her had already been made when she filed a formal complaint, and that the complaints by another woman were fabricated for the purpose of this lawsuit.

For the same reasons discussed above, a jury could find that the hostile work environment was pervasive enough to impute knowledge to the employer here. Plaintiff alleged that incidents happened nearly every day. Further, Defendants admit that Minevich complained about being harassed to Beekman, her manager, throughout her employment-as required by the anti-harassment policy. (ECF No. 98 at 23.) Despite the existence of the policy, Minevich alleges that she was warned not to complain about harassment for fear of retaliation. When she filed a formal complaint on January 19, 2012, Spectrum was again put on notice of the harassment. Defendants' reliance on *Hartleip* is unavailing; Minevich had not yet been terminated at the time of her complaint, so Spectrum had the opportunity to investigate the conduct and take remedial action. 83 F.3d at 776–77. The dispute about the other woman's complaint is a factual dispute appropriate for trial and does not impact Spectrum's duty to investigate alleged harassment. Finally, Plaintiff argues that Spectrum's response to her complaints was ineffective, and Defendant does not defend the investigations it conducted or describe whether anyone involved was reprimanded. Plaintiff has sufficiently alleged defects in Spectrum's investigations to allow her claim to proceed. A jury could find that Spectrum had notice and its response to Plaintiff's claims was ineffective.

Accordingly, summary judgment is **DENIED** on Plaintiff's hostile work environment claim. Genuine factual issues that are material to the claim remain, so judgment is not appropriate as a matter of law.

### 2. RETALIATION

Next, Plaintiff alleges that her termination was the result of retaliation against her because she complained about being harassed. She does not present any direct evidence of discrimination, but attempts to use the *McDonnell Douglas* burden sifting framework to prove retaliation through circumstantial evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case of retaliation, the plaintiff must establish that (1) she engaged in a protected activity, (2) the defendant knew about the protected activity, (3) the defendant took an adverse employment action against her, and (4) there was a causal connection between the protected activity and the adverse employment action. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir.2008). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to give a nondiscriminatory reason for its actions. *Id.* at 526. Then, if such a reason is given, the plaintiff must show that the stated reason is a pretext for discrimination or retaliation. Pretext may be established by demonstrating that the stated reason "(1) had no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000)).

#### a. Prima Facie Case

Defendants argue that Minevich first engaged in protected activity on January 19, 2012, after the decision to terminate her had been made. Thus, they claim that there is no causal connection between the protected activity and the adverse employment action. Further, they argue that the temporal proximity between Plaintiff's complaint and her termination a few weeks later is insufficient on its own to establish retaliation. Finally, Defendants argue that Plaintiff cannot show that she would not have been terminated but for her protected activity because her performance was deficient before and after her complaint.

Plaintiff alleges that she first complained about the hostile work environment at Spectrum on June 4, 2010, when she sent a complaint to her manager and human resources about Elmouchi's treatment of her. Plaintiff claims that the decision to terminate her was made on the basis of information from Defendants Beekman, Green, Elmouchi, and others who harbored a grudge against her because she complained about them. She alleges that these defendants did everything in their power to make Plaintiff appear incompetent, and their reports were merely "rubber stamped" by higher management.

There is no dispute that Plaintiff is a member of a protected class and that she experienced an adverse employment action when she was terminated. The parties dispute when Plaintiff engaged in protected activity. Complaints to human resources personnel concerning possible discrimination are protected activity. *Trujillo,* 495 Fed.Appx. at 655. An employee "may not invoke the protections of the Act by making a vague charge of discrimination." *Blizzard v. Marion Tech. Coll.,* 698 F.3d 275, 288 (6th Cir.2012) (citations omitted) Rather, an employee must "prove that she took an 'overt stand against suspected illegal discriminatory action'" for the action to constitute protected conduct. *Id.* However, an employee does not have to use legal jargon when opposing discrimination: "[t]he court will find opposing activity if the employee's comments, when read in their totality, oppose discrimination." *Yanowitz v. L'Oreal USA, Inc.,* 36 Cal.4th 1028, 1068, 32 Cal. Rptr.3d 436, 116 P.3d 1123 (Cal.2005).

Taken in the light most favorable to Plaintiff, the June 2010 complaint against Elmouchi is protected activity. It alleges that Plaintiff was treated differently than her male counterparts. *See id.* at 288–89 (finding that complaint alleging

plaintiff was treated differently from younger employees was protected activity). Likewise, plaintiff engaged in protected activity when she filed a formal complaint on January 19, 2012. There is no question Spectrum knew about both of these complaints, which were lodged with Plaintiff's supervisors and the human resources department.

Thus, the only remaining prong of Plaintiff's prima facie case is establishing if there was a causal connection between the protected activity and the adverse employment action. Significant questions of fact remain concerning the timing of Plaintiff's termination; the decision to terminate Minevich could have been made as early as November 2011 and as late as February 1, 2012. However, the parties do not dispute that Plaintiff filed a complaint alleging discrimination on January 19, 2012 and was fired less than two weeks later. This short proximity raises the inference of retaliation. Defendants argue that proximity alone is not enough to establish causation. Acknowledging the intra-Sixth Circuit split on this issue, this Court finds that temporal proximity alone is sufficient to establish causation in the prima facie case, but more is required to demonstrate pretext later in the analysis. *See* Troy B. Daniels & Richard A. Bales, *Plus at Pretext: Resolving the Split Regarding the Sufficiency of Temporal Proximity Evidence in Title VII Retaliation Cases,* 44 Gonz. L.Rev. 493 (2008–09). The burden of proving a prima facie case is not onerous, but one easily met. *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir.1997).

Accordingly, Plaintiff has presented a prima facie case, and the burden shifts to Spectrum to give a legitimate, nondiscriminatory reason for her termination.

### b. Legitimate, Nondiscriminatory Reason

 The record provides ample support for Spectrum's proffered reasons for terminating Plaintiff. Spectrum asserts that Plaintiff could not master the duties of a CVT, routinely made mistakes, was inefficient, and was a danger to patients. These are clearly sufficient reasons to terminate a medical employee. So, the burden shifts back to Plaintiff to prove that these reasons were pretext for retaliation.

### c. Pretext

 Pretext may be established by demonstrating that the stated reason "(1) had no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Mickey,* 516 F.3d at 526 (quoting *Dews,* 231 F.3d at 1021). Even if a plaintiff shows that the asserted reason for her termination was erroneous, it will not be deemed pretextual "if the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision." *Upshaw v. Ford Motor Co.,* 576 F.3d 576, 586 (6th Cir.2009). The employer's investigation need not be perfect, but it "must make a 'reasonably informed and considered decision before taking an adverse employment action.'" *Escher v. BWXT Y–12, LLC,* 627 F.3d 1020, 1030 (6th Cir.2010) (quoting *Smith v. Chrysler Corp.,* 155 F.3d 799, 806–07 (6th Cir.1998)).

Plaintiff argues that the reasons for her termination had no basis in fact, claiming that Defendants Elmouchi, Beekman, and Green made up complaints against her in retaliation for her prior harassment complaints, and the ultimate decisionmaker relied on those complaints when making its decision to terminate Plaintiff. Specifically, she notes that the complaints arose only after she reported harassment, and the allegations that she broke sterile technique and caused a patient's infection lacked factual basis and were overblown. Plaintiff claims that she had satisfactory performance evaluations, was never disciplined, suspended, terminated, or received corrective action until after she voiced her complaints to Defendant's management. Finally, Plaintiff alleges that Spectrum's management did not conduct an unbiased investigation into the complaints against her.

Defendants respond by arguing that Minevich's performance evaluations contained low scores and reflected concerns with her abilities, that issues with her performance came up even before the first June 4, 2010 complaint, and that employees other than the alleged harassers were concerned that Minevich could not do her job. Further, Defendants claim that the record supports Minevich's history of sterile technique concerns, and the hospital properly conducted the investigation into the two patient infections for which Minevich was disciplined. Defendants argue that more than temporal proximity is required to show retaliation, and the complaints against Minevich were more than enough to warrant termination.

 Here, there are certainly factual disputes concerning the complaints about Plaintiff's job performance. However, Plaintiff's claims turn on whether Spectrum can be held liable based on the "cat's paw" or "rubber stamp" theories of liability. Cat's paw liability arises when "a biased subordinate, who lacks decision-making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Roberts v. Principi,* 283 Fed.Appx. 325, 333 (6th Cir.2008) (citations omitted). If the decisionmaker relies entirely on the biased subordinate's recommendation or

investigation of the facts, the subordinate becomes the de facto decisionmaker, imposing liability on the employer under agency principles. *See Vance*, 133 S.Ct. at 2439; *EEOC v. BCI Coca–Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 485 (10th Cir.2006). However, when the decisionmaker bases its decision on an independent investigation, "any causal link between the subordinate's retaliatory animosity and the adverse action is severed." *Roberts*, 283 Fed.Appx. at 333 (quoting *Wilson v. Stroh Cos.*, 952 F.2d 942, 946 (6th Cir.1992)). Then, to defeat a finding of pretext, the employer need only show that it had an honest belief in the proffered basis for the adverse employment action based on a reasonable reliance on the facts it knew at the time.

The decision to terminate Minevich appears to have been ultimately made by Patricia Villemure, the executive director of the Meijer Heart Center, and Lisa Shannon, Spectrum's COO. Plaintiff does not claim that Villemure or Shannon harbored retaliatory animosity toward her, but claims that they relied entirely on the fabricated complaints from Defendants Elmouchi and Beekman. Concerns about Plaintiff's work performance certainly arose from the many complaints brought by Elmouchi and Beekman. However, the record reflects that Villemure conducted her own investigation into the complaints and ultimately based her decision on much more than just the complaints from those Defendants.

After Plaintiff filed her January 19, 2012 complaint, Spectrum conducted an investigation into each of her claims. (ECF No. 93–5.) This included Plaintiff's claims that the complaints and discipline against her were retaliation for her earlier harassment complaint. The investigation summary shows that seven staff members and three physicians were interviewed, and each of Minevich's claims were found to be base-less. (*Id.*) The investigation specifically examined whether the complaints against Minevich were brought in retaliation, and concluded that each was warranted and not retaliation. (*Id.*) Further, Spectrum's decisionmakers were aware that three physicians had "lost complete confidence in Zoya's ability to provide safe patient care," did not want Plaintiff performing certain functions, and did not believe she would be able to learn the role. (ECF No. 91–3.) These complaints and others came from employees about whom Minevich had not complained, so they could not all be the result of retaliation. (*See also* ECF Nos. 91–3, 92–2, 94–1, 94–2, 95–3, 95–4, 133–1.) Accordingly, the decision was not made entirely based on a recommendation or investigation done by biased employees or supervisors, and the cat's paw theory of liability does not apply.

For similar reasons, there is no evidence that Spectrum did not make a "reasonably informed and considered decision" based on the facts known to it at the time. *Escher*, 627 F.3d at 1030. Spectrum conducted a reasonable investigation, and there is no indication that Spectrum did not hold the honest belief that Plaintiff was deficient at her job and a danger to patients after the investigation. Although Plaintiff alleges that the investigation was flawed, she has not described any specific deficiencies in how the investigation was conducted, and she has challenged only some of the evidence of the employer's legitimate reasons for terminating her. *Cf. Shazor v. Prof'l Transit Mgmt., Ltd., et al.*, 744 F.3d 948 (6th Cir.2014) (finding the honest belief doctrine did not apply because a one-interview investigation was insufficient). Because Plaintiff has not explained why the complaints from physicians, nurses, and CVTs who had no reason to retaliate against her were pretext, she has not refuted the legitimate, nondiscriminatory reason for her termination Spectrum gave.

Thus, even assuming that Defendants El-mouchi, Beekman, and Green made up complaints about Plaintiff to retaliate against her, Spectrum cannot be held liable for its ultimate termination of Plaintiff. Summary judgment is **GRANTED** in favor of Spectrum.

### 3. GENDER DISCRIMINATION

In the second amended complaint, Plaintiff alleges that Spectrum violated Title VII's prohibition against gender discrimination by engaging in disparate treatment of women. (ECF No. 51 at ¶¶ 243–44.) Specifically, she alleges that Spectrum allowed a workplace environment where male employees were free to engage in inappropriate sexual behavior and harass women without discipline, but women were systematically terminated or forced to resign. (*Id.* at ¶¶ 246–48.) She vaguely alleges that she was treated differently than men in her wages and benefits, opportunities for additional training, and termination. (*Id.* at ¶¶ 249–50.) Plaintiff does not present direct evidence of discrimination, so the *McDonnell Douglas* burden shifting framework, described above, applies.

 To prove a prima facie case of gender discrimination, the plaintiff must demonstrate that she (1) is a member of a protected class; (2) was qualified for the job, (3) suffered an adverse employment decision, and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir.2008). Defendants argue that Plaintiff was not qualified for her job at the time of her discharge and she has not demonstrated that a male employee who committed errors similar to Plaintiff was treated differently.

Plaintiff does not address this claim in her response to the motion for summary judgment. When a nonmoving party fails to respond to a motion for summary judgment, the court properly relies on the facts presented by the moving party; it is not the court's duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Guarino v. Brookfield Tp. Trs.*, 980 F.2d 399, 404 (6th Cir.1992) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir.1989)). It is the nonmoving party's burden to demonstrate that there are genuine issues of material fact, and it is the lawyer's—not the court's—job to identify the relevant evidence and explain how it supports the party's theories. *Id.* at 405–06. However, even when relying on the facts as presented by the moving party, the court may not "blithely accept the conclusions argued in the motion," but must examine the evidence presented to make sure it is legitimate and within context. *Id.* at 407.

Defendants correctly note that Plaintiff has not identified any other employee who was not terminated after being the subject of many complaints about his inability to perform his job responsibilities. Without guidance from the Plaintiff, the Court cannot identify evidence in the record that another employee who engaged in similar conduct (i.e. deficient job performance) was not terminated. Accordingly, there is no evidence that Plaintiff's termination was the result of disparate treatment of women at Spectrum.

 No other adverse employment action can be identified. An adverse employment action is "a materially adverse change in the terms and conditions of [the plaintiff's] employment," usually "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Hollins v. Atl. Co., Inc.*, 188 F.3d 652, 662 (6th Cir.1999); *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257. Plaintiff's complaint alleges that she was denied

training that was offered to men. (ECF No. 51 at ¶ 250.) However, the denial of training opportunities is only an adverse employment action if it had a tangible impact on her growth, advancement, or compensation. *See Blackburn v. Shelby Cnty.*, 770 F.Supp.2d 896, 926 (W.D.Tenn. 2011). Plaintiff has not established that the training she was denied would have had such a tangible impact on her job. *Id.* Likewise, Plaintiff's complaints to Spectrum allege that Elmouchi yelled at her more than male CVTs, but mere yelling or harsh treatment is not an adverse employment action. Title VII is not a general civility code. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The rest of the complaint lacks the factual specificity to allow this court to identify Plaintiff's arguments. The Court is not obligated to scour the record to determine if there are issues of fact concerning Plaintiff's alleged deprivations of wages, benefits, promotions, and employment opportunities.

Accordingly, Plaintiff did not establish a prima facie case of gender discrimination through disparate treatment. Summary judgment is **GRANTED** on Count I.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff's state law claims for negligence, intentional infliction of emotional distress, wrongful discharge, and hostile work environment in violation of the Elliott Larsen Civil Rights Act are barred by the contractually shortened period of limitations, and thus are **DISMISSED.** Summary judgment is also appropriate for Plaintiff's retaliation claim and her disparate treatment claim: Counts I and VII are **DISMISSED.** Summary judgment is **DENIED** on Plaintiff's hostile work environment claim because genuine issues of material fact remain.

### ORDER

Defendants' motion for summary judgment (ECF No. 85) is **GRANTED IN PART AND DENIED IN PART.** Claims I, II, III, IV, VI, and VII are **DISMISSED.**

**IT IS SO ORDERED.**