NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0786n.06

No. 13-6303

**FILED**

Oct 16, 2014

DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

RUBY BLACKMON,

      Plaintiff-Appellant,

v.

EATON CORPORATION,

      Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

**BEFORE:**    BOGGS and CLAY, Circuit Judges; COHN, District Judge.[*]

**CLAY, Circuit Judge.** Plaintiff Ruby Blackmon appeals from the district court's grant of summary judgment in favor of Defendant Eaton Corporation on Plaintiff's hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* She also appeals the district court's decision that the magistrate judge who issued a report and recommendation concerning Defendant's summary judgment motion was not required to recuse himself solely because he had earlier presided over a mediated settlement conference between the parties. For the reasons set forth below, we **REVERSE** and **REMAND** for further proceedings.

---

[*]The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

## BACKGROUND

I.   FACTS[1]

From September 6, 1994 to September 29, 2010, Plaintiff worked at a facility owned by Defendant in Memphis, Tennessee—a warehouse and distribution center for heavy-duty power equipment that Defendant manufactured.  Beginning in December 2009, Plaintiff's second-level manager was Daryl Tetlow.  Plaintiff claims that at their first meeting, Tetlow inappropriately looked at her breasts.  This was just the beginning of a continual stream of sexually harassing behavior that Plaintiff alleges continued the entire time Plaintiff worked under Tetlow.  Plaintiff contends that Tetlow looked at her breasts "whenever he was close enough to do so . . . each and every time he was near [her]."  (R. 58-1, Blackmon Decl., at 446.)  More specifically, Plaintiff stated that "Tetlow would look and stare at [her] breasts in a sexual manner, sometimes quickly, between 3–10 times a week" between December 2009 and September 2010.  (*Id.*)  Plaintiff stated that Tetlow's conduct affected her work "not only because it made [her] uncomfortable and was offensive, but [also because she] was always looking to see if [Tetlow] was near. [Plaintiff] also changed how [she] would dress at work to try and make sure [Tetlow] could not see [Plaintiff's] breasts . . . ."  (*Id.*)

On or about February 9, 2010, Plaintiff asserts that Tetlow stared at her breasts in a particularly aggressive manner.  Plaintiff turned away, but Tetlow apparently approached Plaintiff and rubbed her back "in a sexual way."  (*Id.* at 447.)  Plaintiff could also feel Tetlow's breath on her neck and ear.  Plaintiff told Tetlow not to touch her any more.  This was not a unique occurrence.  According to Plaintiff, Tetlow often rubbed her back and breathed on her

---

[1]For the reasons addressed in Part II of the Discussion, we draw the facts from the full record in this case, including the declaration Plaintiff submitted along with her objections to the magistrate judge's report and recommendation.

neck when Tetlow approached Plaintiff in her work area. Plaintiff allegedly reported the February 9, 2010 incident to corporate headquarters, but nothing was done.

Later on February 9, 2010, Kimberly Hood, then the Human Resources Manager at the Memphis facility, heard two people yelling outside her office. Hood opened her door and saw Plaintiff and Tetlow having an argument. Tetlow ordered Plaintiff back to her work station, but Plaintiff entered Hood's office and asked to make a complaint. Hood asserts that Plaintiff complained that Tetlow "was treating her like a child and she didn't like it." (R. 23-2, Hood Decl., at 95.) After several minutes, Plaintiff left Hood's office and returned to work.

About an hour later, Hood received a report that Plaintiff was in the bathroom crying. Hood went to the bathroom, found Plaintiff, and took her back to Hood's office. Hood states that Plaintiff again complained that Tetlow was treating her like a child, but also reported that Tetlow was sexually harassing her. Hood was surprised by this since she had never personally witnessed Tetlow harassing Plaintiff, nor had Hood heard reports of similar behavior by Tetlow. Plaintiff told Hood that Tetlow had been staring at her chest. Hood, though, thought this was more likely due to reports of Plaintiff keeping a cell phone hidden in her shirt—a violation of company rules. Hood asserts that Plaintiff did not report any other unwanted advances apart from Tetlow's staring. Later that day, Angela Scott, another employee of Defendant's, approached Hood and reported that Tetlow had been staring at her breasts as well. According to Hood, Scott later confessed that Plaintiff had asked her to lie about Tetlow's conduct. Scott herself denies making such a confession.

Hood started an investigation of Plaintiff's claim. According to Hood, Tetlow denied staring at Plaintiff's chest, but noted that several employees had reported that Plaintiff was secreting a cell phone in her blouse while on the job. Plaintiff asserts that she never violated

Defendant's cell phone policy. Based on the reports Hood had received about Plaintiff's alleged cell phone use, as well as Hood's conversations with Scott and Tetlow, Hood concluded that Plaintiff's complaint of sexual harassment "was an effort to deflect attention away from [Plaintiff's] own improper behavior by making a false accusation against [Tetlow]." (*Id*. at 97.) No disciplinary action was taken against Tetlow.

Just three days after the February 9, 2010 incident, Tetlow summoned Plaintiff to his office to discuss a disciplinary write-up. When Plaintiff refused to sign the write-up, thinking it entirely unwarranted, Tetlow allegedly "ran around the office hollering at [Plaintiff] and telling [her] to get out to the shop floor and go back to work, even though it was time for [Plaintiff] to go home." (R. 58-1, Blackmon Decl., at 448.) Plaintiff once again approached Hood and asked to "file a harassment complaint [against Tetlow] for running behind [Plaintiff] hollering and screaming about errors [Plaintiff] had not made." (*Id.*) Hood informed Plaintiff that this conduct did not constitute harassment.

Later in February 2010, Plaintiff moved to a lower-ranking position than her previous job as a verification clerk. In a letter to Plaintiff from Hood, Hood stated that Defendant was transitioning from having three employees at Plaintiff's level to having only one. Plaintiff had apparently been given the opportunity to apply for the single position, but told Hood that she was not interested in the job.

In March 2010, Plaintiff lodged another complaint about Tetlow's conduct. Plaintiff claims she told "Susan in Inventory . . . about [] Tetlow staring at [her] breasts and breathing on [her] ear and neck, and about [Tetlow] rubbing [her] back." (*Id*.) Plaintiff never heard any response to her complaint. However, Plaintiff asserts that she was given a poor evaluation by Tetlow following this complaint. And beginning in April or May 2010, Plaintiff claims that

Tetlow gave her new and demeaning job responsibilities, including "clean[ing] up work stations, empty[ing] garbage cans at the work stations and outside, . . . clean[ing] the entrance windows, clean[ing] the windows at the far end of the building, and sweep[ing] the cigarette butts outside." (*Id.* at 449.) Plaintiff asserts that she told Hood about these new duties, and although Hood allegedly agreed that Plaintiff should not be performing them, Hood did nothing to remedy the situation.

In total, Plaintiff claims she made approximately ten reports concerning Tetlow's behavior: four reports to Hood in February, March, May, and June 2010; four reports around the same times to an administrative manager; and two reports to Lamont Poke, Plaintiff's immediate supervisor, in August and September 2010. Plaintiff asserts that when she complained to Poke in August 2010, Poke responded that "he liked breasts." (*Id.* at 450.)

Plaintiff's fifteen years working for Defendant came to an end in September 2010. On September 24, 2010, Stephanie Jones, a senior receiver in the Memphis facility, was working in what was known as the "FedEx line." Plaintiff, who was working at the other end of the floor, confronted Jones. As Jones stated in her declaration, Plaintiff "walked towards [Jones] and said 'Niggers' while moving into [Jones'] work area." (R. 23-4, Jones Decl., at 110.) Poke and Jennifer Florence, a Human Resources Development Program Participant, questioned Plaintiff and Jones concerning the altercation. Once Jones reported that Plaintiff had used a racial slur, Poke and Florence excused Jones from the meeting so they could speak with Plaintiff alone. During this portion of the meeting, Plaintiff repeated the slur several times. Plaintiff admits that she uttered this slur during the meeting, but asserts she only did so in the process of establishing that she had not said it to Jones. Poke, on the other hand, asserts that Plaintiff "provided numerous examples of how she uses" the slur. (R. 23-3, Poke Decl., at 107.) Poke further

asserts that Plaintiff refused to stop using the slur despite Poke's and Florence's entreaties. Florence eventually told Plaintiff that her use of the word was making Florence uncomfortable.

Florence and Poke reported these events to Hood. Based on the information Florence and Poke gave, Hood came to the conclusion that Plaintiff had violated Defendant's Harassment-Free Workplace Policy and should therefore be terminated. Hood forwarded her recommendation to four high-level employees who approved Hood's conclusions. On September 29, 2010, Hood and Tetlow met with Plaintiff and told her that she was fired. Hood asserts that Plaintiff first denied using the slur, then said "if I used that racial slur and I'm speaking to my same race, it's not a racial slur." (R. 23-2, Hood Decl., at 98.) Plaintiff became extremely agitated and was eventually escorted out of the building. Plaintiff's long relationship with Defendant was over.

## II.   PROCEDURAL HISTORY

After her termination, Plaintiff filed charges with the EEOC, which issued a notice of right to sue on July 7, 2011. Plaintiff then filed a *pro se* complaint in the United States District Court for the Western District of Tennessee on September 28, 2011. In October 2012, Defendant filed a motion for summary judgment. While the motion for summary judgment was *sub judice*, the parties filed a joint motion asking the court to refer the case to the assigned magistrate judge for a mediated settlement conference. The district court granted the motion and the parties held a settlement conference with the magistrate judge on January 7, 2013. The conference involved *ex parte* discussions between the magistrate judge and each party. Plaintiff claims that during the conference, the magistrate judge said things that led Plaintiff to believe that the magistrate judge had "made up his mind about [the] case." (R. 58-1, Blackmon Decl., at 445–46.) The conference did not produce a resolution of the case.

After the settlement conference had taken place, the district court *sua sponte* referred Defendant's summary judgment motion to the same magistrate judge for a report and recommendation. Prior to this, the case had not been referred to the magistrate judge for any purpose other than the settlement conference. The magistrate judge recommended that the district court grant Defendant's motion in full. *See Blackmon v. Eaton Corp.*, No. 11-CV-2850, 2013 WL 4750078, at *8–21 (W.D. Tenn. Sept. 3, 2013). After the report and recommendation was issued, Plaintiff retained counsel for the first time in the litigation and filed objections. Among these objections, Plaintiff asserted that the magistrate judge had "an inherent conflict of interest in serving both as mediator and as a Judge to determine facts and law in the same matter." (R. 58, Pl.'s Objs., at 432.) On September 3, 2013, the district court overruled all of Plaintiff's objections, adopted the report and recommendation, and granted Defendant's motion for summary judgment. *See Blackmon*, 2013 WL 4750078, at *1–8. This appeal timely followed.

## DISCUSSION

### I. TITLE VII CLAIMS

The district court rejected both of Plaintiff's Title VII claims—for hostile work environment and retaliation—on summary judgment. We review this decision *de novo*. *See Shazor v. Prof'l Transit Mgmt.*, 744 F.3d 948, 955 (6th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In reviewing the district court's grant of summary judgment, this Court must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Birch v. Cuyahoga Cnty.*

*Probate Ct.,* 392 F.3d 151, 157 (6th Cir. 2004). With this standard in mind, we address each of Plaintiff's Title VII claims in turn.

### A.    Hostile Work Environment

"A violation of Title VII is established if discrimination based on sex has created a hostile or abusive work environment." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (internal quotation marks omitted). To prevail on a hostile work environment claim, a plaintiff must establish:  "(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and (5) the employer is liable for the harassment. *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). Where the harasser is a supervisor,[2] the plaintiff may establish employer liability "based on either a supervisor's participation in the harassment that created the hostile work environment (subject to an affirmative defense [if no tangible employment action occurred]), or [the employer's] negligence in discovering or remedying harassment by [the plaintiff's] coworkers." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 n.2 (6th Cir. 2013) (internal quotation marks and emphases omitted).

The parties only contest the fourth element of this test—whether the workplace was "permeated with discriminatory intimidation, ridicule or insult sufficiently severe or pervasive to alter the conditions of employment." *Hawkins*, 517 F.3d at 333 (internal quotation marks omitted). This determination "is not susceptible to a mathematically precise test." *Waldo*, 726 F.3d at 814 (internal quotation marks omitted). Courts consider a range of factors, including "the

---

[2]The parties do not dispute that Tetlow was a supervisor—that is, someone "empowered by the employer to take tangible employment actions against" Plaintiff. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (internal quotation marks omitted). "[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).

Here, genuine issues of fact precluded the district court from holding that Plaintiff could not show that the harassment she suffered was severe or pervasive. Read in the light most favorable to Plaintiff, the record shows that Tetlow—Plaintiff's supervisor—stared at her breasts nearly every time the two came into contact for the ten months between December 2009 and September 2010. On more than one occasion, Tetlow paired his offensive staring with offensive physical contact, rubbing Plaintiff's back and breathing on her neck. We have previously "made clear that harassment involving an element of physical invasion is more severe than harassing comments alone." *Hawkins*, 517 F.3d at 334 (internal quotation marks omitted). Plaintiff's complaints to the human resources department fell on deaf ears. When Plaintiff complained about Tetlow to Poke, another supervisor of Plaintiff's, Poke callously told her that he too liked breasts. And Tetlow took his own revenge on Plaintiff by assigning her to demeaning duties far below her pay grade. This course of conduct caused Plaintiff to seek mental health treatment and to go on antidepressants. Plaintiff ceased feeling comfortable at her work station, and constantly had to be on guard to see if Tetlow was nearby. A jury should have the opportunity to consider this entire course of conduct as a whole and determine whether it was severe or pervasive enough to alter the terms of Plaintiff's employment.

The cases Defendant relies upon do not compel the opposite result. The harassment in this case continued for a longer period of time than the offensive conduct in *Burnett v. Tyco Corp.*, 203 F.3d 980, 983 (6th Cir. 2000), and *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 824 (6th Cir. 1997). The harassment in *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000), was infrequent, with each incident separated from the other by many months. *See id.* at 459, 464. Plaintiff, by contrast, suffered a continual barrage of offensive stares and touches for the ten months she worked under Tetlow.

Plaintiff has therefore established a genuine issue of fact as to this element of her claim for hostile work environment. Since this is the only element that Defendant contests, we must remand for a jury to hear this claim.

## B.    Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee because the employee has engaged in conduct protected by Title VII. *See* 42 U.S.C. § 2000e-3(a). Where a plaintiff has no direct evidence of retaliation, she must proceed on summary judgment via the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a prima facie case for retaliation by showing that "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (internal quotation marks omitted). The fourth element "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

The parties dispute only the causation element of Plaintiff's prima facie claim. The record on this point, read in the light most favorable to Plaintiff, shows that a genuine issue of fact exists. Plaintiff made approximately ten reports concerning Tetlow's behavior: four reports to Hood in February, March, May, and June 2010; four reports around the same times to an administrative manager; and two reports to Lamont Poke, Plaintiff's immediate supervisor, in August and September 2010. The record also reflects that Tetlow gave Plaintiff a negative evaluation and assigned her significantly less desirable work after she lodged a complaint about him in March 2010. These facts, combined with the close temporal proximity between the last of Plaintiff's complaints and her termination, suffice to establish the causation element of her prima facie case. *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505–08 2014 (6th Cir. 2014).

The burden now shifts to Defendant to articulate a legitimate nonretaliatory reason for terminating Plaintiff. *See Laster*, 746 F.3d at 730. Defendant has done so. Plaintiff's use of a racial slur in her meeting with Poke and Florence violated Defendant's Harassment-Free Workplace Policy and therefore constituted a nonretaliatory reason for her termination. *See Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009).

The burden thus shifts back to Plaintiff to establish that this justification is pretextual. *See Laster*, 746 F.3d at 730. "Plaintiff can do this by showing (1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate her termination, or (3) that they were *insufficient* to motivate discharge." *Shazor*, 744 F.3d at 959 (internal quotation marks and alteration omitted). Plaintiff points out that during the meeting with Poke and Florence, both Plaintiff and Jones used racial slurs, yet only Plaintiff was disciplined for it. The disparate treatment of Plaintiff and Jones for substantially similar conduct raises an issue of

fact for the jury to decide regarding the truth of Defendant's proffered justification. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 378 (6th Cir. 2002).

Nor does the honest-belief rule assist Defendant under these circumstances. In essence, this rule means that a "dispute over the facts upon which the discharge was based," *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (internal quotation marks omitted), will not suffice to establish pretext if the employer "reasonably relied on the particularized facts that were before it at the time the decision was made." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 599 (6th Cir. 2007) (internal quotation marks omitted). Here, Plaintiff admitted the relevant facts—that she repeated a racial slur in a meeting about the use of that same slur. Defendant has not asserted that its investigation failed to turn up evidence that Jones had used the slur in the same meeting. It is the disparate treatment of Plaintiff and Jones that establishes pretext—not a dispute over the facts of what took place in the meeting. The jury will have the opportunity to weigh the evidence and decide if retaliation was a but-for cause of Plaintiff's termination.

## II. CONFLICT OF INTEREST

In addition to her appeal on the merits of her Title VII claims, Plaintiff asserts that once the magistrate judge presided over a mediated settlement conference between the parties, that same magistrate judge was disqualified from later issuing a report and recommendation on Defendant's motion for summary judgment. In support, Plaintiff relies on 28 U.S.C. § 455(a) and (b)(1), the statute governing disqualification of federal justices, judges, and magistrate judges. The district court rejected Plaintiff's argument, and we review this decision for abuse of discretion. *See United States v. Adams*, 722 F.3d 788, 837 (6th Cir. 2013). We agree with the district court concerning the proper interpretation of § 455.

**Disqualification Under 28 U.S.C. § 455**

Section 455 requires any judge to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). Section 455(a) thus demands recusal "where a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. This standard is *objective* and is not based on the subjective view of a party." *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993) (internal quotation marks omitted). The "bias or prejudice" of § 455(b)(1) "means a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate,* either because it rests upon knowledge that the subject ought not possess, or because it is excessive in degree." *Williams v. Anderson*, 460 F.3d 789, 814 (6th Cir. 2006) (internal quotation marks and alterations omitted).

Both § 455(a) and (b)(1) are subject to the so-called "extrajudicial source doctrine," which vaguely refers to facts the judge learns outside of court proceedings. *See Liteky v. United States*, 510 U.S. 540, 553–55 (1994). "[A]n extrajudicial source for a judge's opinion about a case or a party is neither necessary nor sufficient to require recusal." *Bell v. Johnson*, 404 F.3d 997, 1005 (6th Cir. 2005). However, knowledge the judge gains from extrajudicial sources is "the only *common* basis" for disqualification under § 455. *Liteky*, 510 U.S. at 551. If the extrajudicial source doctrine does not apply, the judge's opinions "do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555.

Applying these standards, the district court rejected Plaintiff's objection to the magistrate judge's report and recommendation based on § 455(a) and (b)(1). The court held that there was no inherent conflict where a magistrate judge presides over a settlement conference, and then acts as an adjudicator. *See Blackmon*, 2013 WL 4750078, at \*4. The court further held that the magistrate judge's participation in the settlement conference was not extrajudicial, and that Plaintiff had not pointed to the sorts of extreme facts that would make recusal appropriate in the absence of the extrajudicial source doctrine. *See id.* Although we do not sanction the district court's referral to the same magistrate judge who presided over mediation between the parties, we hold that the district court did not abuse its discretion in its interpretation of § 455.

First, we cannot find authority for the proposition that participation in a mediated settlement conference *categorically* disqualifies a judge from later deciding a motion in that same case. *See Rehkoph v. REMS, Inc.*, 40 F. App'x 126, 130 (6th Cir. 2002); *see also, e.g.*, *SEC v. ING USA Annuity & Life Ins. Co.*, 360 F. App'x 826, 828 (9th Cir. 2009) ("There is no authority for the proposition that judges must recuse themselves if they served as mediators in a related proceeding."); *Black v. Kendig*, 227 F. Supp. 2d 153, 155 (D.D.C. 2002) (collecting cases). Indeed, the Federal Rules of Civil Procedure contemplate that judges can play a role in settlement discussions. *See* Fed. R. Civ. P. 16(a)(5), (c)(2)(I). The Code of Conduct for federal judges also allows judges to participate in *ex parte* communications with parties "in an effort to mediate or settle pending matters," Canon 3(A)(4)(d), provided that the parties consent—something they had no opportunity to do in this case. We stress that judges are free to recuse themselves from matters after they have presided over mediation. *See Kearny v. Milwaukee Cnty.*, No. 05-C-834, 2007 WL 3171395 (E.D. Wis. Oct. 26, 2007). But § 455 does not automatically compel disqualification in every case.

Second, we do not see facts in the record that would cause a reasonable person to question the magistrate judge's impartiality, or would suggest that the judge had a personal bias or knowledge of contested facts.[3] Plaintiff points to "confidential information [and] information that is not otherwise in the record," and asserts that the magistrate judge must have come into contact with such material. Appellant's Br. at 17. But the magistrate judge's report and recommendation does not reveal knowledge of facts or confidential information not contained in the summary judgment papers. And Plaintiff did not attempt to supplement the factual record by using the local rule designed to facilitate disclosure of otherwise confidential communications that took place during mediation. *See* W.D. Tenn. L.R. 16.1(c)(2)(B). Plaintiff asserts that the magistrate judge spoke *ex parte* with Defendant and expressed his opinions about the case, but these facts alone are not enough to suggest a personal bias in favor of one party or another. "[E]x parte contact does not, in itself, evidence any kind of bias." *Getsy v. Mitchell*, 495 F.3d 295, 311 (6th Cir. 2007) (internal quotation marks omitted).

Furthermore, even if Plaintiff had shown a violation of § 455, we believe she has obtained sufficient relief. Section 455 "neither prescribes nor prohibits any particular remedy for a violation of th[e] duty [it imposes]. Congress has wisely delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 862 (1988). In this case, the magistrate judge issued a nonbinding report and recommendation that the district court reviewed *de novo*. *See* 28 U.S.C. § 636(b)(1). We in turn review the district court *de novo*, and have considered the facts Plaintiff introduced along with her objections to the report or recommendation. This is not a case where, for example, the magistrate judge's decision is reviewable only for clear error, *see* Fed. R. Civ.

---

[3]We do not rule on the question of whether the magistrate judge's participation in the mediated settlement conference was extrajudicial.

P. 72(a), nor one where Plaintiff forfeited an argument by failing to properly object to the report and recommendation. *See Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc). Under these circumstances, the two levels of *de novo* review Plaintiff received—first from the district court and now from us—would suffice to remedy a violation of § 455. *See Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 171–72 (3d Cir. 2004).

## CONCLUSION

Although we hold that the magistrate judge's conduct in this case did not require recusal under § 455, this does not mean that we approve of the district court's referral of Defendant's dispositive motion to the same magistrate judge who presided over a mediated settlement conference. However, because on the merits, Plaintiff's appeal succeeds, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.