NOT RECOMMENDED FOR PUBLICATION
File Name:  15a0064n.06

No. 14-3512

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 21, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ROSILAND MORRIS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| DEPARTMENT OF VETERANS AFFAIRS, Eric K. | ) | COURT FOR THE SOUTHERN |
| Shinseki, Secretary of Veterans Affairs, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE:  SUHRHEINRICH and GRIFFIN, Circuit Judges; and LEITMAN, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiff Rosiland Morris appeals the district court's order granting summary judgment in favor of defendant Department of Veterans Affairs in this action alleging demotion in retaliation for engaging in Equal Employment Opportunity ("EEO") activity, in violation of Title VII of the Civil Rights Act of 1964.  For the reasons that follow, we affirm.

I.

Rosiland Morris is an African-American female who works at the Dayton Veterans Affairs Medical Center in Dayton, Ohio ("DVAMC").  She began her employment for the DVAMC as a diagnostic imaging technician in April 1993 and has worked there continuously

---

[*]The Honorable Matthew F. Leitman, United States District Judge for the Eastern District of Michigan, sitting by designation.

while holding different positions within the medical center. Morris began working as an MRI certified technologist at the DVAMC in 2005 after an MRI machine was first installed. Prior to being assigned to this position, Morris went through extensive training and received MRI certification.

The DVAMC maintains a specific policy on "Magnetic Resonance Imaging (MRI) Safety" that outlines safety procedures to be adhered to by all MRI personnel. The policy specifically notes that "[t]here are risks and safety concerns inherent in an MRI environment due to the generation of strong magnetic fields, and that the magnet is always on." The policy thus dictates that it is the responsibility of MRI personnel to "screen all patients, non-MRI staff and other individuals, prior to allowing access to Zone III" and that any "[n]on MRI staff and other individuals, who are granted access to Zone III . . . are under the direct supervision of MRI personnel." Morris understood these policies and acknowledged that it was her "sole responsibility to ensure that each patient is not in any danger when entering the MRI scanner."

On October 29, 2010, Morris was the only MRI technologist on duty. It was not uncommon for her to run the MRI machine by herself; Morris testified that she was competent to do so. Upon a request by a nurse in the intensive care unit ("ICU"), Morris agreed to add an ICU patient who was on a ventilator to her schedule. Because the MRI machine is a giant magnet that attracts any metals in the same room into the bore of the scanner, patients in need of oxygen must have an MRI-safe oxygen tank and ventilator in order to enter the MRI scanning room (Zone IV). The MRI-safe ventilator is kept in the respiratory therapy unit and is stored on an MRI-safe stand. Morris confirmed with the nurse that the respiratory therapist would be bringing the MRI-safe ventilator, and she accordingly prepped the MRI scanning room, turning on the oxygen source on the wall.

The patient was escorted to the MRI suite by an ICU nurse, Kerry Hankins, and a respiratory therapist, Patricia Hammond. Hammond had never escorted a patient to MRI before. Morris met Hankins and Hammond in the MRI waiting room. She observed the metal oxygen tank when the patient arrived and advised Hammond that nothing metal could go beyond the waiting area. Morris moved the patient into the scanning room and positioned him on the scanning table with the assistance of an x-ray technologist. At some point, Hammond, who also had entered the scanning room, walked out while Morris was adjusting the patient. Hammond reentered the scanning room with the ventilator stand and attached metal oxygen tank. The MRI immediately attracted the oxygen tank, and it flew across the room into the bore of the MRI scanner, narrowly missing Morris and the patient. Miraculously, no one in the room was injured, but the sole MRI machine at the DVAMC sustained approximately $70,000 worth of damage and was out of order for repairs for several days following the incident.

As a direct result of the accident, on November 1, 2010, Dr. Neil Katz, Morris's supervisor and Chief of Therapeutic and Diagnostic Imaging at DVAMC, changed Morris's detail from MRI technologist to general radiology. The change in detail was made as a safety precaution "pending further investigation" of the incident. Dr. Katz also initiated a fact-finding investigation and interviewed all of the people involved. In his initial report, he concluded that Morris committed clear violations of DVAMC's established MRI Safety Policy by failing to screen patients and non-MRI staff prior to allowing access to the MRI scanning room and by failing to check the patient for an oxygen cylinder before entering the area. Dr. Katz also determined that Morris violated the Radiology Policy by failing to verbally explain the risks of the magnetized environment to non-MRI trained personnel. Dr. Katz recommended:

The MRI technologist [Morris] involved in this incident had been involved in another incident resulting in a minor burn to a patient. In both situations, there were issues of communication, and she was counseled about this after the first incident. Because of the severity of the current incident, which could have resulted in severe injury or death of a patient or staff person, the technologist involved has been removed from the MRI section. Further assessment will take place to determine whether permanent removal from the MRI section is warranted.

Dr. Katz's findings and conclusions were relayed to DVAMC's human resources department, which worked with Dr. Katz and Morris's other supervisors to reach a final recommendation on Morris's status. The Medical Center Policy provided a "Range of Penalties for Stated Offenses." The appropriate penalty for a first offense of "[c]areless or negligent workmanship resulting in waste or delay" was admonishment and reprimand. When the nature of the offense was "[e]ndangering the safety of or causing injury to anyone on VA premises through carelessness or negligence," the Policy called for a minimum penalty of admonishment and a maximum penalty of removal.

On April 12, 2011, Morris sought EEO counseling as a result of her change in detail and DVAMC's denial of her attendance at a software meeting for MRI technologists. She then filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") on September 15, 2011. Two claims were at issue: (1) whether Morris was discriminated against when she was not invited to the March 2011 software meeting; and (2) whether she was discriminated against when her request for reinstatement as an MRI technologist was denied.

On November 4, 2011, Morris made a letter request that Dr. Katz return her to her MRI position no later than November 16, 2011. Shortly thereafter, by letter dated November 22, 2011, Dr. Katz formally requested that disciplinary action be taken against Morris as a result of the October 2010 incident. On February 6, 2012, Dr. Katz sent a letter to Morris formally

notifying her of the proposed demotion from Diagnostic Radiologic Technologist, GS-647-9 (MRI Section), to Diagnostic Radiologic Technologist, GS-647-8 (General Radiology), based on a charge of careless workmanship in violation of Medical Center Policy 114-10. The demotion was approved by DVAMC and became effective on May 20, 2012.

On June 27, 2012, the EEOC issued a Final Agency Decision finding no discrimination as to both claims asserted in Morris's EEOC complaint. On August 8, 2012, Morris filed an EEO Complaint alleging that her demotion was in retaliation for her prior EEO activity. On August 21, 2012, she filed the present action in federal district court, alleging that DVAMC discriminated against her on the basis of race and retaliated against her for protected EEO activity, in violation of Title VII. In February 2013, Morris amended her complaint to add the demotion to her retaliation claim.

Following discovery, DVAMC moved for summary judgment on all claims. In its written order issued on May 1, 2014, the district court granted defendant's motion in its entirety. Although the court held that Morris established prima facie cases of retaliation and race discrimination, the court concluded that DVAMC had articulated a legitimate, nondiscriminatory reason for demoting Morris—the serious safety violation that occurred in October 2010—and that Morris then failed to carry her burden of showing by a preponderance of the evidence that this reason was a mere pretext for discrimination and retaliation.

Morris now appeals that portion of the district court's order granting summary judgment on her claim under 42 U.S.C. § 2000e-3(a) that she was demoted in retaliation for engaging in EEO protected activity.

II.

We review de novo the district court's order granting summary judgment. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). "Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Id*. (citing Federal Rule of Civil Procedure 56(c)). "The ultimate question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. (citation and internal quotation marks omitted).

Title VII prohibits an employer from retaliating against an employee because the employee has engaged in conduct protected by Title VII. *See* 42 U.S.C. § 2000e-3(a). In the absence of direct evidence of discrimination, a plaintiff must proceed on summary judgment pursuant to the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Blackmon v. Eaton Corp.*, ___ F. App'x ___, 2014 WL 5286623, at *6 (6th Cir. Oct. 16, 2014). Here, the parties do not dispute the district court's determinations, using this framework, that Morris established a prima facie case of retaliation and that DVAMC fulfilled its burden of articulating a legitimate, nondiscriminatory reason for the demotion of Morris—the October 29, 2010 MRI safety incident. On appeal, Morris raises one assignment of error, arguing that the district court erred in determining that she failed to demonstrate that the reason provided by DVAMC for her demotion was a mere pretext for retaliation for her EEO-related activities.

Morris can establish that DVAMC's stated justification for the adverse action is pretextual in one of three interrelated ways: "(1) that the proffered reasons had no basis in fact,

(2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012). An employer's legitimate reason for adverse action will not be deemed pretext for discrimination until an employee shows that the proffered reason was false, and that retaliation was the real reason. *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally [retaliated] against [her]." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (citation omitted).

In its order, the district court aptly noted that Morris's "only legitimate argument regarding pretext is the contention that the ultimate disciplinary charge asserted against [her], i.e., 'Careless Workmanship,' was insufficient to support her demotion." The court opined:

> The Court questions whether any reasonable fact finder could conclude that the circumstances regarding the MRI incident were insufficient to explain Plaintiff's demotion. Certainly, the "Range of Penalties for Stated Offenses" does state that admonishment and reprimand is the appropriate penalty for a first offense of "[c]areless or negligent workmanship resulting in waste or delay." (Doc. 19-3, PAGEID 179). However, the "Range of Penalties for State[d] Offenses" also specifies the offense of "[e]ndangering the safety of or causing injury to anyone on VA premises through carelessness or negligence[,]" which is punishable by discipline up to and including "[r]emoval[.]"
>
> The alleged offense in this case falls within the category of carelessness or negligence that endangers the safety of persons. In fact, the notice of proposed demotion clearly states in the specification of offense that Plaintiff failed in her duty to "maintain a safe environment for both staff and patients" (Doc. 19-11, PAGEID 217), an offense that, in the Court's opinion, certainly endangers "the safety of . . . anyone on VA premises[.]" (Doc. 19-12, PAGEID 220).
>
> Plaintiff herself confirmed the fact that, as an MRI Tech, "it is [her] sole responsibility to ensure that each patient is not in danger when entering the MRI scanner." (Doc. 19-4, PAGEID 187). Further, no fact finder could reasonably disagree that an oxygen cylinder propelling through the air and into an occupied MRI bore poses the risk of death to those in the area, or at the least, the threat of

serious physical injury to those persons. Plaintiff herself testified that "the oxygen tank "zoom[ed] right by [her] face." (Doc. 19-2, PAGEID 161).

Accordingly, while the technical offense Plaintiff was charged with does not recommend demotion as a penalty, the Court concludes that any inference of pretext arising from an above-guideline penalty, at the most, creates a very weak issue of fact insufficient to reasonably doubt the legitimate, non-discriminatory reason offered by Defendant for Plaintiff's demotion. *See Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 504 (6th Cir. 2007) (stating that "summary judgment is appropriate . . . if the plaintiff 'only created a weak issue of fact as to whether the defendant's reason was untrue' and there is ample evidence to support the employer's position") . . . .

Accordingly, having concluded that Plaintiff presents, at most, a very weak issue of fact regarding pretext, and the record otherwise presents absolutely no discriminatory animus toward Plaintiff, summary judgment in favor of Defendant on Plaintiff's . . . retaliation claims is proper as a matter of law.

We agree with the district court that Morris has failed to present sufficient evidence for summary judgment purposes that DVAMC's real reason for demoting her was because of her EEO-protected actions. Certainly, as the district court properly concluded, because Morris's carelessness endangered the lives of the patient, herself, and all other parties involved, the disciplinary penalty levied against her was not unduly excessive under the circumstances or suggestive of retaliation in the absence of additional evidence of retaliatory animus. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) ("'[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'") (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

Morris points to several other factors that were allegedly ignored by the district court and that purportedly would cause a jury to reasonably doubt DVAMC's justification: the close

temporal proximity between Dr. Katz learning of Morris's EEO activity and his decision to demote her; the DVAMC's handling of Morris's disciplinary action in a manner inconsistent with other disciplinary actions; conflicting reasons as to why Morris was disciplined; and the fact that, contemporaneous with the decision to demote Morris, DVAMC tendered an abeyance agreement that would hold the demotion in abeyance for two years and thereafter rescind it, but would require Morris's completion of additional training and education and the relinquishment of her pending EEO claim.

However, none of these facts, when examined closely, suffices to create the requisite showing of pretext. The simple fact that the investigation was prolonged and may have taken longer than normal is not evidence of pretext. Morris fails to cite any DVAMC policies and procedures requiring investigations to be completed within a certain time period. This court does not require that the employer's process be optimal, but instead requires that the employer "[make] a reasonably informed and considered decision before taking the complained-of action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citation omitted). In this case, Dr. Katz did just that, regardless of the amount of time it took him to reach his informed decision.

Moreover, while it is true that Morris was not officially demoted until February 2012, which was after Dr. Katz became aware of Morris's EEO complaint, the record shows that the process of demotion was set in action well before Dr. Katz knew of Morris's EEO activity. Dr. Katz learned of the EEO complaint "a few weeks" before January 12, 2012. It was approximately two months earlier, on November 22, 2011, that Dr. Katz first submitted a letter to the human resources department proposing Morris's demotion. Therefore, in this case, the

"temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007).

Morris contends that the abeyance agreement offered at the time of her demotion was "a ploy to coerce [her] to dismiss her pending EEO claims." However, Glenn Costie, the CEO and Medical Center Director for DVAMC, testified that abeyance agreements were a standard practice of DVAMC, used to find a mutual ground on which the employer and employee could meet in order to maintain good relations and retain good employees. Costie testified that abeyance agreements were commonly used as a way "to help the employee understand . . . what they've done and why it's against policy and regulation[]"; he considered such agreements as a way to productively discipline employees and noted that abeyance agreements were often given as a way to provide the employee with a second chance. His testimony—that the final requirement in Morris's abeyance agreement requiring her to waive any appeals is a standard condition included in most abeyance agreements and was not a scheme to induce Morris to drop her specific charges—was not contested. In any event, the decision to demote Morris preceded any discussion about providing her with an abeyance agreement. Morris has presented no evidence that the abeyance agreement and her refusal to sign it, thereby waiving her right to appeal, caused her demotion, other than the temporal proximity between her refusal to sign the agreement and the enforcement of her demotion. This does not suffice to establish a genuine issue of material fact on the issue of pretext.

Finally, contrary to Morris's contention, our review of the record does not reveal a conflicting understanding among DVAMC personnel as to the reasons for the disciplinary action against Morris. It is clear from the record and the statements made by all DVAMC representatives involved in the decision-making process that Morris was being disciplined for the

incident that took place on October 29, 2010, and the associated safety implications. There is no evidence of retaliatory animus to be gleaned from these statements.

Accordingly, we affirm the district court's order granting summary judgment in favor of DVAMC on Morris's Title VII retaliation claim.

III.

The judgment of the district court is AFFIRMED.